Larry R. BLASINGAME,
Plaintiff-Appellee,

v.

AMERICAN MATERIALS, INC.,
Defendant-Appellant.

Supreme Court of Tennessee,
at Jackson.

April 18, 1983.

Opinion on Petition to Rehear
July 18, 1983.

Frank C. Gorrell, Jay S. Bowen and C. Dewees Berry, IV, Bass, Berry & Sims, Nashville, George O. Benton, Moss, Benton & Wallis, Jackson, for defendant-appellant.

Edwin C. Townsend, Robert N. Townsend and Edwin Townsend, Jr., Townsend & Townsend, Parsons, for plaintiff-appellee.

## OPINION

FONES, Chief Justice.

We granted defendant corporation's Rule 11 application to review a judgment awarding plaintiff $429,000 for fraudulent breach of an oral employment contract, affirmed by the Court of Appeals. Briefly, the issues in this Court are the application of the general Statute of Frauds, the authority of the president and dominant person in the corporation to bind the corporation to an employment contract agreeing to sell a key employee a one-quarter stock interest in the corporation, the application of the Statute of Frauds of the investment securities chapter of the UCC, and the measure of damages for fraudulent breach of an employment contract that requires valuation of a minority stock interest in a closely held corporation.

### I.

Robert S. Doggett and Melvin Cornwell organized defendant corporation for the purpose of producing emulsified asphalt and concrete for sale. The charter was issued on June 17, 1967. Doggett and Cornwell and their wives were the incorporators and the original stockholders. Both Cornwell and plaintiff had worked for other corporations that had been dominated by Doggett.

Plaintiff had learned how to manufacture emulsified asphalt while working for several of those corporations and testified that only fifteen or twenty persons in Tennessee knew how to make emulsified asphalt.

In its early days, defendant corporation purchased asphalt from other sources before it acquired its own manufacturing facilities. In anticipation of producing its own asphalt, Doggett and Cornwell decided to seek out plaintiff to be in charge of that operation, and Cornwell made the first contact with plaintiff offering that employment. Doggett died before this suit was brought so that the only direct testimony about the oral employment contract came from Cornwell and Blasingame.

In July 1969, when defendant corporation made its offer to plaintiff, he was working as a truck driver in Tupelo, Mississippi, earning, according to plaintiff, $275 to $325 per week. His response to the initial contract was that he would require stock in the corporation to leave Mississippi and move to Decatur County, Tennessee. Cornwell told him that he would have to take that up with Doggett. A meeting was arranged at Doggett's home in Franklin, Tennessee, and the contract of employment was consummated on that occasion. Plaintiff's version was that he was to receive a salary, an annual bonus of five percent of gross profit or seven or eight percent of net profit, whichever was greater, and that he would be allowed to purchase 300 shares of stock in the corporation for $25,000 which could be paid for out of the annual bonuses he would receive. The 300 shares would constitute one-fourth of the stock of the corporation. The other stockholders would be Doggett, Cornwell, and Jere Fly, each owning 300 shares with their respective spouses, or a one-quarter interest in each family block of stock. Plaintiff was asked to accept a beginning salary of $150 per week. Plaintiff accepted the offer, moved his family to Parsons, Tennessee, and worked for defendant corporation until October 13, 1975.

Plaintiff was paid the following bonuses by defendant: $2,200 for 1970; $3,300 for 1971; $5,000 for 1972; $3,500 for 1973; $4,000 for 1974, a total of $18,000. He testified that he was dissatisfied with the amounts but never asked to be shown the corporate statement of earnings for any of the years involved. He told of several conversations with Doggett wherein he inquired about the acquisition of his stock and was told not to worry, that it was forthcoming. In the fall of 1971, the corporation was expanding and plaintiff told Doggett he would like to get his stock, thinking it would cost more after the expansion, but he was assured that it would not cost any more than "at the beginning." In the fall of 1972, after Doggett's son-in-law, Lochte, had purchased 300 shares of stock for $25,000 and had been employed by the corporation, plaintiff confronted Doggett about acquiring his stock. He testified that Doggett explained that his daughter and son-in-law had sold their home and had money to invest and he invited them to invest in the corporation; that the Lochte's stock was non-voting stock; and that plaintiff had nothing to worry about; that he would receive the stock. As a result of that discussion, Doggett wrote plaintiff the following letter:

Robert S. Doggett

River Circle Farm, Sneed Road

Franklin, Tennessee 37064

May 2, 1973

Dear Larry:

Re: Your Receiving Stock in American Materials, Inc.

My ideas about this have not changed and I would welcome you as a stockholder. Of course, stock secured could not exceed 300 shares (which is the amount of blocks of stock owned by present stockholders). I would only agree that your stock would be non-voting stock (non-voting until at such time as the corporation is out of debt to the point to which it is not necessary for any of the stockholders to personally endorse for the corporation to secure operating capital). Such stock secured on a book value basis and as above stated not to exceed 300 shares.

I am in hopes that American Materials, Inc. will prosper as it should and all concerned can realize a nice profit and income from it. There being no reason it should not if all involved do their part.

Personal regards,

/s/Robert S. Doggett

RSD:rl

Cornwell testified that Doggett told him that the letter he wrote plaintiff was not worth the paper it was written on and that he wrote it to pacify plaintiff.

In May 1974, Doggett brought Doyle Vaughn into the corporation as General Manager and Vaughn acquired 300 shares of stock for $25,000. Plaintiff again became concerned about his stock and his position in the corporation, as Vaughn was superior to him in the day-to-day operation of the corporation.

On October 13, 1975, plaintiff went to Doggett's home in Franklin, Tennessee, asked about his stock, and Doggett responded that he was sorry, but that "things had not worked out between us." Plaintiff gave notice that he would resign in thirty days, but later that same day upon his return to Parsons he learned that Doggett had fired him.

Plaintiff returned to Mississippi and started his own asphalt business. He acknowledged at trial that he had been making preparation to go into business for himself for several months before the October 1975 confrontation with Doggett. Doggett died September 1, 1976. Plaintiff filed this suit on January 21, 1977, and the case was tried on June 15 and 16, 1978.

The learned chancellor rendered written findings, dated November 10, 1978, as follows:

(1) That plaintiff carried the burden of proof, "as to the offer extended to him prior to his acceptance of his involvement with defendant corporation";

(2) That Doggett ruled the corporation with an iron hand and "they perpetrated a fraud on plaintiff, specifically mention-

ing the testimony that Doggett said he, 'only wrote the letter [of May 2, 1973] to pacify the plaintiff.' ";

(3) Denied plaintiff's claim for a bonus based upon a percentage of earnings but held that plaintiff was entitled to the same bonuses that other stockholders had received, "and this will continue to this date";

(4) That plaintiff was entitled to the actual value of 300 shares of defendant's stock, less a set-off of $25,000, the purchase price of the stock, none of which had ever been paid by plaintiff; and

(5) Expressly denied the remedy of specific performance prayed for in plaintiff's complaint.

In response to requests for clarification of the findings dated November 10, 1978, the chancellor ruled (1) instead of the actual value of 300 shares, plaintiff was entitled to the actual value of twenty-five percent of American Materials, Incorporated, as of November 10, 1978,[1] and (2) plaintiff was entitled to the same bonuses that other stockholders were paid, only through calendar year 1975, the year plaintiff was terminated. A reference to the clerk and master was ordered to determine the value of twenty-five percent of the corporation as of November 10, 1978, and the amount of bonus due plaintiff through calendar year 1975.

The master found that the value of twenty-five percent of defendant corporation as of November 10, 1978, was $324,988 less the $25,000 purchase price; and that stockholders had received a total of $22,000 through calendar year 1975 while plaintiff had received only $18,000. Three CPA's testified for plaintiff that the value of twenty-five percent of defendant corporation was $672,500, $657,572, and $660,419.68, respectively. The CPA called by defendant calculated the value of twenty-five percent of defendant corporation by three different methods re-

sulting in sums of $115,350, $127,033, and $165,670. The master's finding was arrived at by averaging the highest opinion value of $672,500 and the lowest of $115,350, to which was applied a 17.5% discount because of the limited marketability of a minority interest in a closely held corporation. The master reported plaintiff entitled to a judgment in the sum of $303,988.

Both parties filed exceptions to the master's report. The chancellor held that it was improper to arrive at the actual value of the stock of defendant corporation by averaging the expert testimony. He held that the "preponderance of the evidence rule applied," and found the actual value of "300 shares of stock to be $600,000 as of November 10, 1978." The chancellor applied a 25% minority interest discount, deducted the purchase price, added the $4,000 bonus due, and rendered judgment for plaintiff in the sum of $429,000.

A majority of the Court of Appeals affirmed.

## II.

The threshold issue in this Court is whether enforcement of the alleged oral employment contract, which clearly was not to be performed in one year, was barred by the Statute of Frauds, T.C.A. § 29–2–101(5). The majority of the Court of Appeals held that although Doggett's letter of May 2, 1973, varied too much from the alleged oral contract and was too indefinite to form the basis of the contract, the failure of the letter to state properly the agreement and to take the contract out of the Statute of Frauds was due to the wilful and deliberate fraud of Doggett. The intermediate court found that those circumstances invoked the rule of *Hackney v. Hackney,* 27 Tenn. 452 (1847). The dissenting member was of the opinion that the facts found by the majority did not bring the case within

1. On November 12, 1974, the corporation had issued and had outstanding 1,200 shares of stock, and if plaintiff has been issued 300 shares his ownership would have been 20% of the corporation. By plaintiff's own admission he was aware that 300 shares had been issued

to Doggett's daughter Roberta Lochte and her husband in 1972, an issue which obviously diluted his alleged promise of 25% of the stock to 20%. Sometime between November 12, 1974, and November 12, 1975, the corporation issued 300 shares to Doyle Vaughn *et ux.*

his interpretation of *Hackney.* Our view of the principle of law governing this issue renders it unnecessary that we address the applicability of *Hackney.*

■ The chancery court and the Court of Appeals have concurred in factual findings, both implicitly and explicitly, that throughout the relevant time period, July 1969 to October 1975, plaintiff was led to believe that the oral employment contract he made with defendant corporation would be honored; that in reliance thereon, plaintiff proceeded to perform his part of the bargain; and that in doing so, he so altered his position as to suffer an unconscionable loss if the corporation was allowed to rely upon the Statute of Frauds. There is material evidence in this record to support those concurrent factual findings and they are binding in this Court. T.C.A. § 27–1–113. Those facts bring this case squarely within the Doctrine of Partial Performance of a verbal employment contract, involving personal property, as distinguished from an oral contract for the sale of land,[2] adopted by this Court in *Buice v. Scruggs Equipment Co.,* 194 Tenn. 129, 250 S.W.2d 44 (1952) and followed in *Foust v. Carney,* 205 Tenn. 604, 329 S.W.2d 826 (1959).[3] The position of plaintiff was analogous in every material respect to that of Buice, who was orally induced to render valuable services as an employee of Scruggs Equipment Company, at a crucial time for the corporation, and one Keen, who had acquired all of the corporate stock. The principal consideration to Buice was the promise to sell him 300 shares of the corporate stock. After Buice had fully performed his part of the bargain, including the surrender of a prior valuable employment contract with the defendant corporation, Keen refused to sell Buice the 300 shares of stock.

Justice Burnett, writing for the Court, articulated the controlling principle as follows:

"This doctrine of partial performance to take the verbal contract out of the operation of the Statute of Frauds is purely an equitable doctrine and is a judicial interpretation of the acts of the parties to prevent frauds. The acts of the appellant relied on as partial performance had been done by him in pursuance to the averred contract and agreement and are clearly referable thereto. 'The plaintiff must be able to show such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself of the statute to escape its performance; and also that the plaintiff, in reliance on this representation, has proceeded, either in performance or pursuance of his contract, so far to alter his position as to incur an unjust and unconscious injury and loss, in case the defendant is permitted after all to rely upon the statutory defense.' 49 Am. Jur., Sec. 427, page 733. We think this quotation fairly sums up the obligation of the complainant in the instant case and that by the averments of the bill the complainant has met these obligations." 194 Tenn. at 137, 250 S.W.2d at 48.

We hold that doctrine applicable to this case and that defendant will not be heard to invoke the Statute of Frauds to prevent enforcement of the oral employment contract which the lower courts have concurrently found that plaintiff has established by the proof.

### III.

■ Next, defendant insists that the Statute of Frauds, set out in T.C.A. § 47–

---

**2.** Tennessee courts will not enforce an oral contract for the sale of land based upon partial performance alone. *See, e.g., Baliles v. Cities Service Co.,* 578 S.W.2d 621 (Tenn.1979); *Knight v. Knight,* 222 Tenn. 367, 436 S.W.2d 289 (1969); *Goodloe v. Goodloe,* 116 Tenn. 252, 92 S.W. 767 (1905).

**3.** *Buice* involved application of the Statute of Frauds for the old Uniform Sales Act, now

repealed, and *Foust,* the Statute of Frauds for the Uniform Commercial Code—Sales; yet these provisions have a common source with T.C.A. § 29–2–101, that is, the Statute for the Prevention of Frauds and Perjuries, 29 Charles II, c. 3 (1676), and should be construed alike. Thus it follows that the part performance exception to the Statute of Frauds in *Buice* and *Foust* is equally applicable in the instant case.

8–319 which governs the sale of securities, applies here and excludes any part performance, except in case of delivery of the stock or payment for the stock. The chancellor denied defendant's motion to amend its answer, after trial, to rely on that section of the investment -securities chapter of the U.C.C. Nevertheless, it is unnecessary that we decide whether the amendment should have been allowed because the stock of defendant corporation does not fall within the definition of a "security" in T.C.A. § 47–8–102(1)(a), and therefore T.C.A. § 47–8–319 is not applicable. Indeed, there is no proof in this record that the stock of American Materials, Incorporated, "is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment." T.C.A. § 47–8–102(1)(a)(ii). In fact, the record supports the inescapable conclusion that the only sale of stock in the history of this closely held corporation occurred in July 1977, when Cornwell *et ux* sold their 300 shares to the corporation for $122,500.[4] The proof adduced on the value of the stock makes it clear that there was no market available for this stock.

In *Kenney v. Porter,* 557 S.W.2d 589 (Tex.Civ.App.1977), the defendant sought to rely upon the Statute of Frauds in Article 8, U.C.C., in resisting an oral contract to sell stock in a closely held corporation. The Texas Court said that it was a question of fact whether the stock of a corporation was dealt in upon securities exchanges or commonly recognized as a medium for investment, or otherwise came within the definition of a security; that it was incumbent upon the party relying upon Article 8 of the U.C.C. to produce evidence sufficient to satisfy the definitional requirement of section 8–102 as a prerequisite to its application. *See also Zamore v. Whitten,* 395 A.2d 435 (Me.1978) and *Rhode Island Hospital v. Collins,* 117 R.I. 535, 368 A.2d 1225 (1977) where stock in closely held corporations was denied classification as a "security" because it was not dealt in by securities exchanges or commonly recognized as a medium for investment.

As heretofore indicated, the history of defendant corporation's stock and the restriction upon its sale in the by-laws revealed in this record upon other issues clearly rendered it impossible for defendant to show that its stock was dealt in by securities exchanges or was commonly recognized as a medium for investment.

## IV.

Defendant contends that Doggett, as president, could not bind the corporation to a contract to issue stock to a third party without the approval of the Board of Directors and that such approval was not given.

In July 1969, when Doggett and plaintiff negotiated the oral employment contract between plaintiff and the corporation, the corporation had issued only 600 shares of its stock, 300 to Doggett and his wife and 300 to Cornwell and his wife. The minute book of the corporation contains minutes of an organizational meeting held on June 21, 1969, reflecting those four individuals as subscribers to its stock. The next minutes record a meeting of stockholders in October 1970. No directors were elected at either of those meetings. Cornwell testified that the four stockholders were directors, but he did not testify as to when they were elected. It is clear that in July 1969, Doggett and Cornwell were conducting all of the business of the corporation either with their wives' knowledge or their acquiescence. Further, the record supports and the lower courts have concurred in a finding that Doggett, not only in July 1969, but throughout his lifetime, exercised absolute authority over the affairs of defendant corporation and his actions and decisions were never questioned, altered, or rejected by its Board of Directors. The contention that Doggett did not have the requisite actual or apparent authority to bind this corporation at all

---

**4.** Also, the by-laws contained a restriction requiring stockholders desiring to sell to offer their shares to the corporation at book value and if rejected to the other stockholders.

times material to this litigation, and especially in July 1969, is totally without merit. *See V.L. Nicholson Co. v. Transcon Investment and Financial Ltd., Inc.,* 595 S.W.2d 474 (Tenn.1980); *Rich Printing Co. v. Estate of McKellar,* 46 Tenn.App. 444, 330 S.W.2d 361 (1959); Fletcher's Cyclopedia of Corporations § 449 (1982); Tennessee Jurisprudence *Agency* § 6 (1982).

### V.

Defendant has raised a number of issues with respect to the damages awarded for the value of plaintiff's stock interest.

■ Defendant asserts that it was error to award plaintiff a twenty-five percent stock interest, that if he was entitled to any award the evidence supported only an award of 300 shares. Further, defendant points out that in October 1975, when plaintiff was terminated, the corporation had issued an outstanding 1,500 shares of stock, and therefore plaintiff's 300 shares would represent 16.6% of the corporate stock. The short answer to this contention is that while the preponderance of the evidence only supports an award of 300 shares, there is a concurrent factual finding that plaintiff was promised and is entitled to a twenty-five percent interest in the corporation, and that this Court cannot disturb that finding. T.C.A. § 27–1–113.

■ Defendant insists that the method of valuation used by plaintiff's expert witnesses was erroneous and resulted in an excessive valuation of plaintiff's stock interest. Defendant points to the fact that all three of plaintiff's experts used only one method of valuation, called either the Earnings Value Method or Capitalization of Earnings Method, and that only the earnings for 1978, the corporation's best earnings year, were considered. By that method and the use of the corporation's best year, each of plaintiff's experts valued plaintiff's stock interest as being within the narrow range from $657,572 to $672,500. Our research convinces us that the majority of jurisdictions require at least the use of three years as an appropriate minimum period to validate the Earnings Value Method; the tradi-

tional period is five years, yet for some corporations the appropriate period might even be as many as ten years. *See, e.g., Piemonte v. New Boston Garden Corp.,* 377 Mass. 719, 387 N.E.2d 1145 (1979); *Universal City Studios, Inc. v. Francis I. duPont & Co.,* 334 A.2d 216 (Del.1975); *Application of Delaware Racing Association,* 42 Del.Ch. 406, 213 A.2d 203 (Del.1965); *Sporborg v. City Specialty Stores,* 35 Del.Ch. 560, 123 A.2d 121 (1956). We hold that any valuation of earnings that does not take into consideration a minimum of three years corporate earnings experience should be rejected, unless the expert opinion clearly and convincingly establishes the validity of a lesser period.

■ The basic rule prescribing the measure of damages for fraud is that the injured party should be compensated for the actual injuries sustained by placing him or her in the same position that he or she would have occupied had the wrongdoer performed and the fraud not occurred. *See, e.g., Conover v. Baker,* 134 Vt. 466, 365 A.2d 264 (1976); *Daniels v. Coleman,* 253 S.C. 218, 169 S.E.2d 593 (1969); *Harsche v. Czyz,* 157 Neb. 699, 61 N.W.2d 265 (1953). Applying that rule to this case, it is our opinion that plaintiff stood in the same position on October 13, 1975, as any minority stockholder entitled to dissent and to receive the fair value of his or her shares under the circumstances set forth in T.C.A. § 48–909(1) and (2), such as merger, sale, lease, or exchange of all or substantially all of the assets of the corporation, alteration of any preferential or preemptive right of such shares, etc. Our corporate statutes do not prescribe the method or methods to be used in determining the "fair value" of the dissenting stockholder's stock nor have Tennessee courts addressed that issue. However, a number of our sister states, having virtually identical statutes governing the rights of dissenting stockholders upon merger, etc., to which the stockholder may object, have established valuation methods to be used in determining fair value. An accurate summary of the methods used is found in the following

quotation from *Brown v. Hedahl's-Q B & R, Inc.,* 185 N.W.2d 249 (N.D.1971):

"It appears, as a matter of general law, that there are three primary methods used by courts in determining the fair value of shares of dissenting shareholders. These three methods are the market value method, the asset value method, and the investment or earnings value method. The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. This method is most reliable where there is an established market for the stock. The asset value method looks to the net assets of the corporation valued as a 'going concern', each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets as determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence. The investment value method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings record. Dividends paid by the corporation are considered in its investment value. Generally, all the elements involved in these methods are considered in determining the value of the dissenter's stock. 19 Am.Jur.2d Corporations, Sec. 518, Anno., 38 A.L.R.2d 442; N., Valuation of Dissenter's Stock, 79 Harv.L.Rev. 1453 (1966); N., Elements in Valuation of Corporate Stock, 55 Mich.L. Rev. 689 (1957)."

*Id.* at 254.

In *Brown,* North Dakota adopted the Delaware rule requiring that all three methods be used in determining the fair value of a dissenter's shares, assigning such weight to each method as may be appropriate considering the type of business, the objectives of the corporation, and other relevant factors.

In *Brown,* the Supreme Court of North Dakota, in assigning the percentage of weight to be given each of the three valuation methods discussed guidelines to be considered as follows:

"Normally, where there is an established market for the stock of a corporation the market price is given great weight. In other cases where there is no reliable market and none can be reconstructed, market price is not considered at all. However, as to the Q B & R stock, there has been a limited market such that we can properly reconstruct a realistic market price for a share of Q B & R stock. *Application of Delaware Racing Association,* [42 Del.Ch. 406, 213 A.2d 203 (Del. 1965)]; *Vought v. Republic-Franklin Insurance Co.,* [117 Ohio App. 389, 192 N.E.2d 332 (1962)]. We have assigned a weight of 50% to the asset value of Q B & R. Normally, a higher value is assigned only in cases where the primary purpose of the corporation is to hold assets, such as real estate, for the purpose of allowing them to appreciate in value. *Swanton v. State Guaranty Corporation,* 42 Del.Ch. 477, 215 A.2d 242 (Ch.1965); *In re General Realty & Utilities Corporation,* 29 Del.Ch. 480, 52 A.2d 6 (Ch.1947). In other words, assets are weighed more heavily when they are held for appreciation purposes rather than for commercial retail or wholesale purposes designed to generate earnings. Here the assets of Q B & R primarily consisted of inventories for sale and the necessary buildings and equipment to carry out this business purpose. The inventories held by Q B & R would depreciate in value rather than appreciate but the value of the lots and building is substantial in relation to the inventories and will likely appreciate in value. We have assigned a weight of 25% to the investment or earnings value of Q B & R. Normally, in a commercial business, earnings are given great weight as the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value. *Sporborg v. City Specialty Stores,* [35 Del.Chan. 560, 123 A.2d 121 (1956)]; *Felder v. Anderson, Clayton & Co.,* 39 Del.Ch. 76, 159 A.2d 278 (Ch.1960). Q B & R was such a business, whose primary purpose was to generate

earnings for its shareholders. The fact that Q B & R has failed in the past several years to generate such earnings does not mean that earnings are not an important part of the value of Q B & R stock. *In re Olivetti Underwood Corp.,* 246 A.2d 800 (Del.Supr.1968); *Application of Delaware Racing Association, supra.* However, after Hedahl's had purchased control, a new board of directors was elected in December 1967. This resulted in new, and, we believe, improved management of Q B & R. Although earnings should ordinarily weigh heavily in determining the true value of the stock in a commercial corporation, we believe, under the circumstances, it is proper to give less weight in this case. Accordingly, we have determined that the 'fair value' of a share of Q B & R stock as of March 8, 1968, is $138.65 per share.

|  | Value | x | Weight | = | Result |
|---|---|---|---|---|---|
| Asset | $242.81 | x | 50% | = | $121.40 |
| Market | 69.00 | x | 25% | = | 17.25 |
| Earnings | 0.00 | x | 25% | = | 0.00 |
|  |  | Total Value Per Share | | | $138.65" |

*Id.* at 259.

There are numerous other factors that expert witnesses may deem relevant on the question of the weight to be given each of the three methods, but the courts must make the final determination of the appropriate weight to be given each method as well as the ultimate value of the stock interest.

We adopt the Delaware rule requiring the use of all three methods in determining the fair value of a dissenting minority stockholder's shares.

■ The chancellor and the Court of Appeals have erred as a matter of law in their determination that plaintiff was entitled to have his stock interest valued as of November 10, 1978. While defendants have only obliquely raised this issue, it is an error of law of the character that we must address pursuant to T.R.A.P. 13(b).

Defendant corporation terminated plaintiff's employment on October 13, 1975. That same day, plaintiff learned that his oral employment contract had been breached, and on that same day, his cause of action for fraud accrued. Reason, logic, and the general principles of the law of damages dictate that the property that is the subject of the fraud must be valued as of the date the fraudulent representations were made *or* the date of the discovery of the fraud and accrual of the cause of action. *See* 37 Am.Jur.2d *Fraud and Deceit* § 365, "Time as of which damages and property value determined" (1968). Obviously, it would be inappropriate and would render plaintiff's suit worthless if we applied the date the fraudulent representations were made. It is just as obvious that the date of November 10, 1978, has no efficacy whatsoever as the appropriate time to value the stock in defendant corporation which has been denied plaintiff. The effect of the chancellor's ruling was to give plaintiff specific performance as of October 13, 1975, and to assume that plaintiff would have held that minority stock interest until the court rendered its findings. Plaintiff did not tender the purchase price of the stock on October 13, 1975, or at any other time, and there exists no valid theory upon which he can sustain November 10, 1978, as the appropriate date for valuing his stock interest. In addition, as we have indicated, on the day plaintiff's services were terminated by the corporation, his interests and those of the majority stockholders of the corporation became adverse and antagonistic, and his position parallelled that of a minority stockholder entitled to the benefits of T.C.A. § 48–909. T.C.A. § 48–909(5) reads as follows:

"(5) The fair value of shares shall be determined as of the day prior to the date on which the vote was taken approving the proposed corporate action, excluding any appreciation or depreciation of shares in anticipation of such corporate action."

The date the defendant corporation took the action that gave rise to plaintiff's right to receive the fair value of his minority stock interest was October 13, 1975. There is no reason to use the day prior because the action of the corporation adverse to plain-

tiff would have no effect upon the value of the shares. Therefore, we hold that plaintiff's stock interest must be valued as of October 13, 1975.

We affirm the judgment of the Court of Appeals holding defendant corporation liable to plaintiff for a stock interest equivalent to one-fourth of the corporation's value and affirm the award of $4,000 as the correct sum due plaintiff for unpaid bonuses. The award of $425,000 is set aside and this cause is remanded to the trial court for appropriate proceedings to determine the value of a stock interest equal to one-fourth of the value of the corporation as of October 13, 1975, consistent with the principles announced herein. Upon determination of the value of the stock interest awarded plaintiff, judgment shall be entered for that sum, less $25,000, plus $4,000, and the net award to plaintiff shall bear interest from the date of the filing of the complaint, at the statutory rates that prevailed, from time-to-time, for computing interest on judgments.

Costs in this Court are adjudged against plaintiff.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.

## OPINION ON PETITION TO REHEAR

FONES, Chief Justice.

Plaintiff has filed a petition to rehear to which we find it appropriate to respond.

First, plaintiff says we have rejected the use of any period less than three years in determining the earnings value to be assigned in arriving at the value of plaintiff's stock interest in defendant, American Materials. We have made no judgment whatever with respect to the merit or lack of merit of any of the expert testimony presented at the trial of this case. If the

expert testimony had been such as to satisfy the requirements of the weighted average method[1], as plaintiff seems to suggest, it was unacceptable because the valuation date used was November 10, 1978, and the stock should have been valued as of October 13, 1975. We have simply enunciated a guideline that says that the use of less than a three year corporate earnings experience is suspect, and should be rejected unless the expert opinion clearly and convincingly establishes the validity of a lesser period. That discretion remains open to the trial judge in this case.

Second, plaintiff questions whether the Court has directed the trial court to use the formula on page nineteen of the opinion, in assessing the weight to be given to the three values in the weighted average method. The answer is no. The percentages assigned there were the results reached by the *Brown* court, after weighing the expert testimony and the factors discussed in the quotation that precedes the mathematical computation. The *Brown* case merely provided an example of the use of the formula. There is no rigidity to the weighted average method in the proportion to be assigned the three value factors, and, of course, they may vary widely from one corporation to another.

Obviously, there are very significant differences between the Q B & R stock in *Brown* and the stock of American Materials. It appears from the expert testimony heretofore adduced that earnings are more significant in the instant case than in *Brown* and assets are less significant. The experts testifying in this case have all recognized that American Materials stock should be discounted for lack of marketability of a minority interest. The master applied a seventeen and one-half percent discount and the chancellor a twenty-five percent discount. Under the weighted average

1. The Supreme Court of Delaware has recently modified the use of the "Delaware block" or weighted average method in a case involving the rights of minority shareholders in a cash out merger between the corporation in which they held stock and its majority owner. *See Weinberger v. U O P, Inc.,* 457 A.2d 701 (Del.

1983). The modification was, at least partially, in response to a Delaware statute directing that "the Court shall take into account *all relevant* factors." *See* 8 Del.C. § 262(h) (Emphasis added.) We do not find anything in *Weinberger* that causes us to alter the adoption of the weighted average method.

method it is up to the experts initially and the court ultimately, to assign a weight to market value, in relation to assets and earnings, that correctly reflects that negative factor of lack of marketability of a minority interest, along with the other factors relevant to the price for which a share is selling or could be sold to a willing buyer—the ultimate test of the market value prong of the three prong inquiry. Likewise, the other two values will vary widely from one corporation to another in the weight to be assigned in the formula.

Finally, plaintiff says we should not have adjudged all of the costs against plaintiff. We agree that that was a mistake. The costs incurred in the Supreme Court only, are adjudged seventy-five percent against defendant and twenty-five percent against plaintiff, the costs in the other courts to remain as adjudged, and costs on remand to be adjudged by the trial court.

Otherwise, the petition to rehear is denied.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.