**ELK YARN MILLS, et al.,**
**Defendant–Appellant,**

**v.**

**514 SHARES OF COMMON STOCK OF**
**ELK YARN MILLS, INC., etc., et al.,**
**Plaintiffs–Appellees.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 21, 1987.

Permission to Appeal Denied by
Supreme Court Dec. 7, 1987.

H. Lee Barfield, II, Robert E. Cooper, Jr., Bass, Berry & Sims, Nashville, for defendant-appellant.

Thomas O. Bagley, Stevens, Bagley & Stevens, Fayetteville, William S. Russell, Russell & Russell, Shelbyville, Robert Walker, Eugene J. Podesta, Jr., Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Barry B. White, Lewisburg, for plaintiffs-appellees.

## OPINION

CANTRELL, Judge.

In these consolidated actions four groups of shareholders dissented from a plan of merger of Elk Yarn Mills with Elk Merger Corporation and asked the court to set the value of their shares pursuant to T.C.A. § 48–1–909. The primary questions on appeal involve the trial judge's valuation of and the weight given to the factors used in the "Delaware Block" method of evaluation. The corporation also disputes the trial judge's award of attorneys fees and costs to the dissenting shareholders.

## CORPORATE HISTORY

In 1900 a group of investors started Elk Yarn Mills in Fayetteville, Tennessee for the purpose of spinning cotton yarn for sale to textile manufacturers. The company acquired land and built a factory from which it still carries on the business. In 1961 the company opened a second plant in North Carolina. In 1968 the North Carolina operation moved into a leased building and started spinning polyester yarn.

In 1983 the company had 10,000 shares of common stock outstanding. Ernest Rees, Jr., a major shareholder, was also the Chairman of the Board, President, and Chief Executive Officer of the company. He also participated in the voting trust which controlled between 3,500 and 4,000 of the common shares. These holdings

gave Mr. Rees effective control of the Board of Directors.

In 1982 and the early part of 1983 three members of the Board of Directors prepared an offer of $160.00 per share for all of the outstanding shares of the company. However, before the offer could be made to the Board one of the three potential purchasers died and the offer was never formally presented.

In 1983 the son of the deceased member of the Board made a proposal to buy the outstanding shares for $160.00 per share. The offer included an arrangement whereby Mr. Rees would be retained as a consultant for the remainder of his life. His salary was to continue at the same level for two years and then be substantially reduced. Before the offer was presented to the Board of Directors Mr. Rees persuaded the offeror to withdraw it.

Later that same year Mr. W.K. Whitmore, Jr., an executive vice-president of the company, approached Mr. Rees with a proposal for a leveraged buy-out of the company's shareholders at $175.00 per share. Under Mr. Whitmore's proposal Elk Merger Corporation, a corporation organized by Mr. Whitmore, would be merged into Elk Yarn Mills and each share of the common stock of Elk Yarn Mills would be converted into the right to receive $175.00 cash. The proposal also called for Mr. Rees to be retained as a consultant at a salary of $50,000 a year for the first three years and then $35,000 annually for life.

The Board of Elk Yarn Mills approved the merger on December 19, 1983. On December 21, 1983 a notice of a shareholders meeting and a proxy statement went out to all shareholders announcing a special meeting of the shareholders on January 5, 1984 for the purpose of approving the merger. At the shareholders meeting the plan was approved with 7,129 shares voting in favor, 1,961 against, and 910 not voting. The plaintiffs in these consolidated actions, representing 1,651 of the dissenting shares, perfected their rights to have the fair value of their shares determined by the court.

## THE VALUATION METHOD

The parties all agree that the correct method for calculating the value of the shares in this case is the Delaware Block method adopted by our Supreme Court in *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659 (Tenn.1983). In this calculation the value of the shares of the corporation is calculated using each of the primary methods of determining value, i.e. the market, the assets, and the earnings. The value found by each of the three methods is then multiplied by a weighted factor expressed as a percentage of the whole so that the products of the calculations when added together will equal one hundred percent and represent the total value of each share.

The weight to be given the particular values takes into consideration the type of business, the objectives of the corporation and other relevant factors. *Blasingame,* 654 S.W.2d at 666.

The method is best illustrated by the trial judge's calculations in this case. He first determined that the market value of each share was $100.00, that the asset value was $539.10 per share, and that the value based earnings was $306.38 per share. He then found that the market value should be given a weight of five percent, the asset value thirty-five percent, and the earnings value sixty percent. Plugging these figures into the equation yielded the following results:

| | | | |
|---|---|---|---|
| Market Value | — $100.00 × 5% = | $ | 5.00 |
| Asset Value | — $539.10 × 35% = | | 188.69 |
| Earnings Value | — $306.38 × 60% = | | 183.83 |
| Fair Value per Share | | = | $377.52 |

As this discussion indicates, much is left to the discretion of the evaluator. With respect to the weight to be given the various elements of value the Delaware Supreme Court said in *Application of Delaware Racing Association,* 42 Del.Ch. 406, 213 A.2d 203 (1965):

> The question of what weight to give the various elements of value lies always within the realm of judgment. There is no precise criterion to apply to determine the question. It is a matter of discretion with the valuator. In the absence of a clear indication of mistake of judgment,

or a mistake of law, we think this court should accept the reasoned exercise of judgment of the vice chancellor and not substitute its own guess as to what the proper weighting should be.

In *Blasingame* our Supreme Court adopted with approval the following discussion from *Brown v. Hedahl's–QB & R, Inc.*, 185 N.W.2d 249 (North Dakota 1971):

Normally, where there is an established market for the stock of a corporation the market price is given great weight. In other cases where there is no reliable market and none can be reconstructed, market price is not considered at all ... We have assigned a weight of fifty percent to the asset value of QB & R. Normally a higher value is assigned only in cases where the primary purpose of the corporation is to hold assets, such as real estate, for the purpose of allowing them to appreciate in value ... In other words, assets were weighed more heavily when they are held for appreciation purposes rather than for commercial, retail or wholesale purposes designed to generate earnings ... We have assigned a weight of twenty-five percent to the investment or earnings value of QB & R. Normally in the commercial business earnings are given great weight as the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value.

With these general principles in mind we will examine the issues raised on this appeal.

## A. THE WEIGHT GIVEN TO THE MARKET VALUE

■ The parties all agree that the market value of $100.00 per share is approximately correct. The record shows that in the years 1980 through 1982 there were only eleven separate transactions in the company's stock. The largest block traded was 78 shares. The price fluctuated between $100.00 per share and $125.00 per share. In the five years prior to the evaluation date there were eleven cash transactions and seven of those transactions involved corporate insiders.

The trial judge in arriving at the weight to be given that value found that for many years the only opportunity the shareholders had to sell their shares was to allow the company to redeem them or to find someone else who would pay the $100.00 price set by the company. The court further found that since 1978 when anyone called the company offices to inquire about the value of the stock the going price was quoted as $100.00 per share.

We agree with the trial judge that the market value of the shares of Elk Yarn Mills should be given minimal weight. Where the transactions had been so sporadic and the last trade involving someone not an officer or director of the company occurred nearly four years prior to the evaluation date, the information would not be very reliable as an indication of the true value of the shares. In addition, as we will discuss in a later section of this opinion, the practice of the corporation of paying only a small amount of its earnings in dividends is undoubtedly a factor in keeping the price of the stock at a low figure. Therefore, we concur in the trial judge's conclusion that the market value of the shares should be given a weight of only five percent.

## B. THE ASSET VALUE

■ The trial judge found that based on the value of the assets the stock in the company would be $539.10 per share. The appellant asserts that this finding is erroneous because the judge should have used comparable sales to arrive at the value of the Tennessee plant and because the judge did not deduct any liquidation expenses from the net asset value. As a subissue the appellant insists that if the assets are valued as a going concern the good will of the corporation will be counted twice in the Delaware Block method since it also shows up in the calculation based on earnings.

First we think the appellant misses the point with respect to the evaluation of the corporation as a going concern. It is a going concern; and the dissenting shareholders are entitled to a valuation of their shares on that basis. The Supreme Court in *Blasingame* adopted this language from

*Brown v. Hedahls–QB & R, Inc.:* "The asset value method looks to the net assets of the corporation valued as a 'going concern', each share having a pro rata value of the net assets." 654 S.W.2d at 666. The overwhelming weight of authority approves the valuation of the assets of the corporation as a going concern. *In re Olivetti Underwood Corporation,* 246 A.2d 800 (Delaware 1968); *In re Application of Delaware Racing Association,* 42 Del.Ch. 406, 213 A.2d 203 (1965); *Sporborg v. City Specialty Stores,* 35 Del.Ch. 560, 123 A.2d 121 (1956). If the value of the corporation's assets is to be made on a going concern basis, it necessarily means that the anticipated costs of liquidating the assets should not be taken into account. See *Rosenblatt v. Getty Oil Company,* 493 A.2d 929 (Del.1985).

In addition we think the appellant confuses "going concern" value with the good will of the corporation. Although the two may be related they are not the same. A going concern is simply an enterprise which is being carried on as a whole and with some particular object in view; the going concern value is the value which inheres in a plant where its business is established as distinguished from which has yet to establish its business. *Black's Law Dictionary,* 4th Ed., p. 821. On the other hand good will is more intangible. It means something in a business which gives a reasonable expectancy or preference in the race of competition. *Id.* at p. 823.

> The good will of a business is the reasonable expectation of its continued profitable operation. It involves the name of the firm, its reputation for doing business, the location, the number and character of its customers, the former success of its business.
>
> *Young v. Cooper,* 30 Tenn.App. 55, 203 S.W.2d 376 (1947).

We think the difference between a going concern value and the good will of a business is illustrated by the case of *Young v. Cooper* where the chancellor ordered the sale of a partnership as a going concern but refused to order the sale of the partnership name.

Therefore the evaluation of the assets of a corporation as a going concern does not mean that the asset value has been enhanced by a consideration of the good will of the corporation.

Finally we fail to see from the record where the good will of the corporation figured in the appraisal of the dissenters' expert whose opinion was in the main adopted by the trial judge. The expert used by the dissenting shareholders in this phase of the litigation was first employed by the corporation at or about the time of the merger and requested to perform an appraisal on the company's plant and real property. Mr. Whitmore had the appraisal done at the request of Third National Bank which was financing the takeover of the company. The expert made his report on January 24, 1984 basing his appraisal on all three recognized appraisal methods, the income approach, cost approach, and market approach. He concluded that the plant had a value of $2,500,000.00 and that the company owned an additional 212 acres of land that was not being used which he valued at $212,000.00. Mr. Whitmore used this appraisal in his negotiations with the Third National Bank to obtain the financing for the takeover.

After these actions were brought by the dissenting shareholders the company retained another expert to do an appraisal on the Tennessee plant. This appraisal, dated October 8, 1985, relies solely on the sales comparison approach in arriving at the value of the Tennessee plant. In arriving at his conclusion the expert compared thirteen real estate sales from 1974 through 1985. However, consistent with the company's position that in arriving at the net asset value the company should be considered as if it were undergoing liquidation, this expert deducted from his appraisal the anticipated costs involved in liquidating the assets. None of his comparable sales were of plants that were operating.

After hearing all the proof the trial judge accepted the figures produced by the dissenters' expert and, with some slight modifications, used those values in arriving

at the net asset value of the company stock.

As we have previously pointed out, the value of the stock should be calculated on a going concern basis. Therefore, the trial judge justifiably viewed the opinion given by the company's expert as too conservative. We think the trial judge was justified in accepting the opinion given by the expert employed by the dissenting shareholders.

## C. THE WEIGHT GIVEN THE ASSET VALUE

█ The trial judge assigned a weight factor of thirty-five percent to the asset value. The appellant insists that the figure should have been fifteen percent. As we have indicated previously the weight to be given the various elements of value in the Delaware Block calculation is a matter of sound judgment rather than mathematical certainty. *See Application of Delaware Racing Association*, 42 Del.Ch. 406, 213 A.2d 203 (1965).

In this case the trial judge cited as justification for the weight given to the asset value the facts that the company was holding assets over and above what was necessary for its operation and that the company had consistently paid a small dividend while putting a large share of its net profits back into the business. In addition the company had 212 acres of undeveloped land surrounding its plant in Fayetteville.

The facts cited by the trial judge are borne out in the record. The balance sheet shows that company held over 1.1 million dollars in cash or certificates of deposit and had approximately 1.17 million dollars in accounts receivable as of the date of the merger. Coupled with the fact that in the last five years the company had paid out only twenty percent of its earnings in dividends (compared with an industry average of forty-eight percent) we think the proof indicates that the management of the company had established a pattern of accumulating earnings for capital asset investment. Without a significant weight given to asset value the shareholders would lose the benefit of the retained earnings and capital investment.

We note that in *Brown* the court assigned a weight of fifty percent to the asset value because the assets of the corporation were primarily inventories and building and equipment. The value of the building and equipment was substantial in relation to the inventories and would likely increase in value. Therefore the fifty percent weight was justified.

We think the thirty-five percent weight given to the asset value in this case is also justified.

## D. THE EARNINGS VALUE

The trial judge assigned an earnings value of $306.38 to each share of the company stock and a sixty percent weight factor to that figure. The appellant does not dispute the weight factor but insists that the earnings value should be $142.50 per share.

The dispute in this area is about the appropriate price/earnings ratio to apply to the company's average earnings per share over the previous five years. The parties agree that over that five year period the company averaged earning $28.50 per share.

The trial judge used a price/earnings ratio of 10.75. His justification is based on two factors. The first is the fact that a 10.75 price/earnings ratio was the ratio used in the proxy statement sent by the company to shareholders in attempting to explain and justify the cash merger offer of $175.00 per share. The trial judge held that the company was estopped to assert a different price/earnings ratio than the one relied on in the proxy statement.

█ We agree with the appellant that on the basis of the proxy statement alone the company is not estopped to rely on a different price/earnings ratio. We think the essential element of reliance is missing in this case. Although the dissenters argue that the officers of the corporation breached their fiduciary duties to the shareholders in asserting in the proxy statement that a fair price/earnings ratio was 10.75 we think that the misrepresentation must have caused some action on the part of the shareholders in order for them to complain.

In this case they obviously did not rely on the representations in the proxy statement. They elected to dissent and have the value of their shares determined by the court. Therefore, the element of reliance is missing in this case. *See Arthur v. Lake Tansi Village, Inc.*, 590 S.W.2d 923 (Tenn.1979).

■ However, the trial judge based his decision to use a price/earnings ratio of 10.75 on other factors in the record. The record showed that the average price/earnings ratio on all New York Stock Exchange issues in January of 1983 was 11.04. A sample of fourteen related companies from Moody's Stock Guide for the years 1983 and 1984 showed an average price/earnings ratio of 11.2. In addition the record reflects that in arriving at the 10.75 figure in the proxy statement the company compared Elk Yarn Mills to five publicly traded textile companies. Therefore, the record contained evidence from which the trial judge could have concluded that 10.75 was the proper price/earnings ratio. The appellant asserts that to select an appropriate price earnings ratio the appraiser must examine the ratios of publicly traded companies that are most similar to the subject company. In pursuing that object the company hired an appraiser who started with fifty different public companies in the textile industry. From that list of fifty he eliminated, for one reason or another, all of the companies except three. These three companies had a price/earnings ratio at the end of 1983 of 5.00.

The selection of a price/earnings ratio is always difficult and imprecise. In this case we are of the opinion that the trial judge was within the realm of reason in selecting a price/earnings ratio of 10.75. Where this figure is comparable to fourteen companies in Moody's Stock Guide and is in fact a figure urged on the shareholders in the proxy statement, we are of the opinion that the trial judge was not in error in selecting this figure.

### E. ATTORNEYS FEES AND EXPENSES

Under T.C.A. § 48–1–915(c) the Code provides that cost and expenses, including reasonable attorneys fees, shall be assessed against the corporation providing that the action of the dissenting shareholders is not arbitrary or vexatious or otherwise not in good faith. In this case the trial judge awarded fees to each of the attorneys representing the four groups of dissenting shareholders. The fees awarded were based on the hours spent in the litigation and included an hourly rate of from $100.00 to $125.00 per hour.

■ The appellant contends that awarding fees to each of the attorneys representing the four groups of shareholders requires the company to pay four times for the preparation and trial of this action. While we agree that the statute does not require the corporation to pay more than is reasonable for the orderly and efficient preparation and trial of the action, the trial judge found as a fact that the lawyers for the dissenting shareholders collaborated and cooperated in preparing for trial and during the trial itself in order to avoid a duplication of effort. There is no proof in the record that preponderates against that finding of the trial judge. *See* Rule 13(d), Tenn.R.App.P. Nor does the record indicate that the appellant sought at any time to have the court direct or control the conduct of the lawsuit so as to eliminate any possible duplication of effort.

In addition the company is at least partially responsible for the four sets of lawyers. Instead of bringing the action as required by T.C.A. 48–1–915(a) the company did nothing after the dissenting shareholders had made their positions known. Therefore the shareholders had to bring an action in order to protect their respective rights. While the effect of the company's refusal to act is debatable, it at least caused four actions to be filed instead of one.

We think the appellants contention that the trial court required the company to pay for a duplication of effort on the part of the lawyers representing the dissenting shareholders is without merit.

■ The appellant also contends that the hourly rate allowed by the trial judge is

excessive. The record contains three affidavits from attorneys not connected with this litigation. Their opinions on the usual rate charged by attorneys in Lincoln County for complex litigation ranged from $60.00 per hour to $125.00 per hour. The attorneys representing the dissenting shareholders submitted their own affidavits showing that their usual fees for this type of litigation ranged up to $125.00 per hour.

Disciplinary Rule 2-106 adopted in Rule 8 of the Rules of the Supreme Court sets forth the factors to be used as guides in fixing a reasonable attorney's fee. These factors include the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly, the amount involved and the results obtained, and the fee customarily charged in the locality for similar legal services.

Based on the cited factors and the proof in the record of the customary hourly rate charged for similar services we think the trial judge was justified in setting the fee for the attorneys using $100.00 to $125.00 as the hourly rate. The issues involved in this case were complex, and the amount involved was great. Therefore, the fee at the top of the range supported by the proof in the record is justified.

█ Finally, the appellees insist that the trial judge should have rendered a judgment for the attorneys' fees instead of taxing the fees as part of the costs. The object sought by the appellees is for the attorneys' fees to draw interest at the legal rate as a part of the judgment.

We are persuaded that the trial judge was correct in taxing the fees as part of the costs. We think where the statute says "costs and expenses of any such proceeding, including reasonable attorney fees, shall be determined and assessed against the corporation ..." T.C.A. § 48-1-915(c), it means that the corporation shall pay such fees as a part of the costs of the litigation. We are, however, persuaded that the attorneys representing the appellees are entitled to a reasonable fee for the services rendered on this appeal.

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Lincoln County for the enforcement of the judgment and for a determination by the trial court of any additional fees to which the lawyers representing the dissenting shareholders may be entitled for the services rendered on appeal. Tax the costs on appeal to the appellant.

TODD, P.J., M.S., and BIRCH, Special Judge, concur.