**GENESCO, INC., Plaintiff/Appellant,**

v.

**Joseph J. SCOLARO, Diana J. Slotznick, Trustee FBO Benjamin Slotznick and Trustee FBO Lisa Ann Slotznick, and Jacob Landis, Defendants/Appellees.**

Court of Appeals of Tennessee,
Middle Section at Nashville.

Sept. 1, 1993.

Permission to Appeal Denied by
Supreme Court Jan. 31, 1994.

Paul A. Alexis, Jeffrey S. Bivins, Boult, Cummings, Conners & Berry, Nashville, for plaintiff-appellant.

G. Clay Bailey, Jr., Tune, Entrekin & White, Nashville, Stewart D. Roll, Persky, Shapiro, Salim, Esper, Arnoff, Molfi, Co., Cleveland, OH, for defendants-appellees.

### *OPINION*

CANTRELL, Judge.

The primary question on this appeal is whether the Chancery Court of Davidson County was correct in using the Delaware Block method to determine the value of dissenting shareholders' preferred stock. The appellant also insists that the lower court erred in awarding attorney fees and costs to the dissenter under Tenn.Code Ann. § 48–23–302(b)(2). We affirm.

### I.

In December of 1987, Genesco, Inc., a Nashville-based shoe and apparel manufacturer, amended its charter to permit the exchange of common shares for its subordinated serial preferred stock. Pursuant to Tenn.Code Ann. § 48–23–101, et seq., the amendments to the charter gave the preferred shareholders the right to dissent and to demand the fair value of their shares.

The appellee, Jacob Landis, owned 573 shares of Series 2 preferred stock and 1,530 of Series 3 preferred stock. He exercised his right to dissent and demanded payment of the fair value of these shares. When Mr. Landis and the company were unable to agree on the fair value of the stock, Genesco filed this action in the Chancery Court of Davidson County for a judicial appraisal. *See* Tenn.Code Ann. § 48–23–301.

As summarized in Genesco's brief, the Series 2 preferred stock had the following characteristics:

(1) *Dividends.* Dividends on the Series 2 shares are cumulative and are payable quarterly at an annual rate of six percent (6%) of the then prevailing redemption price;

(2) *Liquidation.* Series 2 shares have a liquidation preference equal to the then prevailing redemption price plus all accumulated and unpaid dividends;

(3) *Ranking.* The Series 2 shares rank equally in right to dividends and liquidation payments with the Series 1 preferred stock, subordinate to the $4.50 Convertible Preferred Stock and three series of Subordinated Preference Stock, but senior to other series of Serial Preferred Stock, Employees' Preferred Stock, and Common Stock;

(4) *Mandatory Redemption.* Beginning in 1974 and continuing thereafter, Genesco is required to redeem the Series 2 shares, unless Genesco is in arrears in dividend or redemption payments on senior or equally ranking stock;

(5) *Optional Redemption.* Genesco may redeem Series 2 at any time at the option of the board of directors at an amount equal to the then prevailing redemption price plus all accumulated and unpaid dividends;

(6) *Redemption Price.* The redemption price on Series 2 shares is $45 if redeemed in 1974 and increases $2 per annum for each calendar year thereafter;

(7) *Conversion.* Series 2 shares are not convertible into common or any other stock; and

(8) *Voting.* Each holder of Series 2 shares is entitled to one vote for each share on all matters.

The Series 3 preferred stock, also summarized in Genesco's brief, had the following characteristics:

(1) *Dividends.* Dividends on the Series 3 shares are cumulative and are payable quarterly at an annual rate of $4.75;

(2) *Liquidation.* Series 3 shares have a liquidation preference equal to $100 per share, plus all accumulated and unpaid dividends;

(3) *Ranking.* The Series 3 shares rank subordinate to Series 1 and Series 2 preferred stock, as well as the Convertible Preferred Stock and three series of Subordinated Preference Stock, but senior to the other series of Serial

Preferred Stock, Employees' Preferred Stock, and Common Stock;

(4) *Mandatory Redemption.* There is no mandatory redemption of Series 3 shares;

(5) *Optional Redemption.* Genesco may redeem Series 3 shares at any time at the option of the board of directors at an amount equal to the redemption price of $100 per share after 1978, plus an amount equal to all accumulated and unpaid dividends;

(6) *Conversion.* Each Series 2 share is convertible into Genesco common stock at the conversion ratio of 2.10526 shares per Series 2 share; and

(7) *Voting.* Each holder entitled to two votes for each share on all matters.

In 1975, as a result of serious financial problems, Genesco suspended dividend payments and redemptions on all of its subordinated serial preferred stock. Under the charter, as it existed prior to the amendments approved on February 4, 1988, the Series 1 and Series 2 preferred stock ranked equally and no payments could be made on any junior series until all arrearages were paid to all senior series.

As of February 1988, Genesco had the right to redeem the Series 2 preferred stock for $119.41 per share and to redeem the Series 3 preferred stock for $161.75 per share.

The parties disagreed about which method of valuation to use. Genesco employed what it called the Discounted Cash Flow method, while Mr. Landis advocated using the Delaware Block method, which had been used in prior Tennessee cases. The chancellor granted summary judgment to Mr. Landis on this issue, holding that the Tennessee Supreme Court in *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659, 667 (Tenn. 1983), had adopted the Delaware Block as the appropriate method for valuing dissenter shares. The chancellor then referred the

case to a special master "to report to this Court with his recommendations as to findings of fact and conclusions of law on the fair value of the Genesco Series 2 and 3 Subordinated Serial Preferred Stock, pursuant to T.C.A. § 48–23–101, *et seq.*"

In a later order the chancellor amended the order of reference, instructing the special master to make a finding as to whether Genesco had acted arbitrarily, vexatiously, or not in good faith in dealing with the dissenters. *See* Tenn.Code Ann. § 48–23–302(b)(2).

## II.

### The Delaware Block Method

In *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659, 667 (Tenn.1983), our Supreme Court adopted the Delaware Block method of valuing corporate stock. In *Elk Yarn Mills v. 514 Shares of Common Stock of Elk Yarn Mills, Inc.,* 742 S.W.2d 638, 640 (Tenn.App.1987), we described the way the method works.

In this calculation the value of the shares of the corporation is calculated using each of the primary methods of determining value, i.e. the market, the assets, and the earnings. The value found by each of the three methods is then multiplied by a weighted factor expressed as a percentage of the whole so that the products of the calculations when added together will equal one hundred percent and represent the total value of each share.

The weight to be given the particular values takes into consideration the type of business, the objectives of the corporation and other relevant factors. *Blasingame,* 654 S.W.2d at 666.[1]

At the hearing before the special master, Genesco stuck by its position that the Discounted Cash Flow method was the appropriate method to use in determining the value of Mr. Landis' stock. Mr. Landis offered an expert appraiser who had previously testified in Tennessee cases. Using the Delaware

---

1. An example of how the calculation works appears in *Elk Yarn Mills.* The example is as follows:

| | | | | |
|---|---|---|---|---|
| Market Value | — | $100.00 × 5% | = | $ 5.00 |
| Asset Value | — | $539.10 × 35% | = | $188.69 |
| Earnings Value | — | $306.38 × 60% | = | $183.83 |
| Fair Value per Share | — | | | $377.52 |

*Id.* at 640.

Block method, he found that neither Series 2 nor Series 3 had a trading history; consequently, he assigned no weight to the market value factor.

The appraiser found from Genesco's January 31, 1988, balance sheet that the actual going concern net asset values of Series 2 and 3 shares were $695.80 and $1,091.07 respectively. In recognition of the restrictions placed on the shares, however, he reduced these values to the so-called "contract values" i.e. the amounts payable upon dissolution or winding up of the corporation. The result was a value of $119.41 for Series 2 shares and a value of $161.75 for Series 3 shares. To these values he applied a weight of 80% based on his estimation of the company's strong cash position.

For the earnings component of the calculation, the appraiser found from the Genesco reports, covering the eight most recent reporting periods, that the shares earned an average of $28.50 for the Series 2 shares and an average of $50.73 for Series 3 shares. Using three different capitalization rates and assigning the resulting earnings a weight of 20% he arrived at a range of values. The appraiser then averaged this range of values to come up with a final opinion that the Series 2 shares had a value of $131.32 each and the Series 3 shares a value of $193.11 each.

The special master filed a report finding that: (1) the Series 2 shares had a value of $131.32 each; (2) the Series 3 shares had a value of $193.11 each; and (3) Genesco should pay Mr. Landis' fees and expenses because Genesco had acted arbitrarily, vexatiously, and not in good faith. Subsequently, the chancellor confirmed the report and entered a final judgment on the issue of the value assigned to the Series 2 and 3 preferred shares.

### III.

■ Genesco asserts that the chancellor erred in holding that the Delaware Block method was the only method to be used in finding the fair value of the preferred stock. While we do not read the chancellor's order so strictly, even if the appellant is correct, the question still remains "is the Delaware Block method an acceptable method in this case?" In other words, should we say, as a matter of law, that the chancellor erred in using that method?

Genesco urges this court to adopt a rule that the Delaware Block method is per se unacceptable in finding the value of preferred stock. While we concede that the only Tennessee reported cases which have applied the Delaware Block method have involved common stock, there are many reported cases from other jurisdictions applying the method to find the value of preferred stock. *Fitzgerald v. Investors Preferred Life Ins. Co.*, 258 Ark. 966, 530 S.W.2d 195 (1975); *Warren v. Baltimore Transit Co.*, 220 Md. 478, 154 A.2d 796 (1959); *In re Tudor City Fifth Unit Inc.*, 17 A.D.2d 794, 232 N.Y.S.2d 758 (1962), aff'd 13 N.Y.2d 812, 242 N.Y.S.2d 345, 192 N.E.2d 222 (1963); *Jacques Coe & Co. v. Minneapolis–Moline Co.*, 31 Del.Ch. 368, 75 A.2d 244 (1950).

We do not think a per se rule should be adopted either for or against use of the Delaware Block method in appraising preferred stock. There are some situations where the conditions attached to the stock make it so unique that another method would produce a more accurate result. *See Pioneer Bancorporation, Inc. v. Waters*, 765 P.2d 597, 599 (Colo.App.1988). However, we do not think this case falls into that category. We conclude, therefore, that the Delaware Block method was appropriate for use in this case.

### IV.

### Fair Value Versus Fair Market Value

■ Genesco insists that the special master and the chancellor erred in not determining the "fair market value" of the dissenter's shares, i.e., the price at which the stock could be sold if both a willing seller and a willing buyer existed. This is the aim of the Discounted Cash Flow method advocated by Genesco, which predicts what a buyer would pay for an asset that would yield a certain projected return in the future.

The Tennessee Corporation Act, however, provides that each dissenter is entitled to a judgment for the "fair value" of his shares.

Tenn.Code Ann. § 48–23–301(e)(1). We think the difference between "fair value" and "fair market value" is significant. In cases where the market value can be readily established the two terms may be approximately equal. *See Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn.1983). However, where there is no reliable market (as here where the stocks were not traded and had no trading history) "market price is not considered at all." *Id.* With no established market the question simply is one of finding what part of the company—its assets and its potential for earning a return—is represented by each fraction of the company's ownership.

## V.

### Fair Value Versus Redemption Value

■ Genesco asserts that the values of the shares could not exceed the value at which the company could have redeemed the shares at the time this controversy arose. We think this conclusion is erroneous. The company did not exercise its right to redeem the shares. When the company chose not to do so and put into play the events that raised the right to dissent, it waived its contractual right to redeem the shares. The focus then turned from the redemption value to the statutory fair value of the stock. The fair value may or may not bear any relation to the value at which the shares could be redeemed. The redemption value is based on assumptions that took place in the 1970s and were written into the charter at that time based on the parties projections of what would happen in the future. With the rise and fall of the company's fortunes through the years the chances are great that the value at which the company could redeem the shares would diverge from the statutory fair value of the shares.

## VI.

■ Genesco asserts that the special master and the chancellor erred in finding that Genesco acted arbitrarily, vexatiously, and not in good faith in evaluating the dissenter shares. Tenn.Code Ann. § 48–23–302(b)(2).

When a dissenting shareholder demands payment of the fair value of his shares in the corporation, the statute requires the corporation to furnish the dissenter with: (1) a statement of the corporation's estimate of the fair value of the shares; and (2) an explanation of how the interest was calculated. Tenn.Code Ann. § 48–23–206(b)(2) and (3).

In addition, this court found bad faith where a company did not rely on an evaluation by an established appraiser, never raised its initial offer, and never provided the defendant with information respecting the method of its determination of value. *East Tennessee Transp., Inc. v. Ketron*, No. 295, 1991 WL 28943, at *5 (Tenn.App. filed March 7, 1991).

The special master in the present case found as a fact that Genesco did not consult an established appraiser, relying instead on its own investment banker to update previous opinions it had furnished for exchange offers; that neither Genesco nor its investment banker considered the Delaware Block method or made a reasonable judgment that it was inappropriate and inferior to the Discounted Cash Flow method employed by Genesco; that Genesco and its investment banker destroyed some of the information underlying their cash flow assumptions which was necessary to test the validity and accuracy of their calculations; that Genesco never raised its initial offer even after the chancellor granted summary judgment to Mr. Landis on the correct method to use in appraising the shares; that Genesco was less than forthcoming in providing information and consistently resisted the request for discovery and sought the court's protective orders, resulting in an unduly protracted, expensive, and acrimonious dispute.

We think the findings of the special master are supported by the evidence and that the special master and the chancellor were justified in finding that Genesco's conduct was arbitrary, vexatious, and in bad faith.

## VII.

■ Mr. Landis raises two issues on appeal. First, he asserts that the findings of the special master confirmed by the chancellor are conclusive on this court under Tenn.

Code Ann. § 27–1–113 and the decision in *Schoen v. J.C. Bradford & Co.*, 642 S.W.2d 420, 424 (Tenn.App.1982). The appellee is correct with respect to the findings of fact made by the special master which were confirmed by the chancellor. We think, however, the main thrust of the case is a question of law, i.e., is the Delaware Block method appropriate for use in evaluating shares of preferred stock. Therefore, we have chosen to treat the issues as they have been raised rather than simply affirming on the perceived conclusiveness of the findings of the special master.

Second, the appellee asserts that the special master was in error in holding that this was not an appropriate case for punitive damages. We think the special master was correct. In *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn.1992), the Tennessee Supreme Court held that punitive damages were appropriate in only the most egregious cases and that punitive damages can be supported only by clear and convincing proof that the defendant acted either intentionally, fraudulently, maliciously, or recklessly. *Id.* at 901. We do not think the actions of Genesco in this case fall within the parameters set forth by the Supreme Court in *Hodges.*

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant.

LEWIS, J., and WILLIAM H. INMAN, Senior Judge, concur.