# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **JANICE BLALOCK YATES**, | ) | Dyer County Chancery Court |
| | ) | No. 96-C-60 |
| Plaintiff/Appellee. | ) | |
| | ) | |
| VS. | ) | C.A. No. 02A01-9706-CH-00122 |
| | ) | |
| **WILLIAM MARK YATES**, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

**FILED**

**December 4, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Chancery Court of Dyer County at Dyersburg.
**Honorable William B. Acree, Jr., Judge**

**Douglas W. Wilkerson**,
**W. Lewis Jenkins, Jr.**,
WILKERSON GAULDIN & HAYES, Dyersburg, Tennessee
Attorney for Defendant/Appellant.

**Thomas H. Strawn**, KELLY, MILLAR, STRAWN & KELLY
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Defendant William Mark Yates (Husband) appeals the final divorce decree entered by the trial court which awarded primary physical custody of the parties' minor child to Plaintiff/Appellee Janice Blalock Yates (Wife), ordered the Husband to pay child support and alimony *in solido* to the Wife, and distributed the parties' real and personal property. We affirm.

## I. Factual and Procedural History

The parties were married for seventeen years and had one child, a daughter. Throughout the marriage, the Husband, who had a B.S. degree from the University of Tennessee at Knoxville, worked in his family's furniture and appliance business, General Appliance and Furniture Company, located in Dyersburg. The Husband's father, Billy Yates, had been the president of General Appliance for almost fifty years. At the time of trial, the Husband managed the company's appliance division. The Husband, also a General Appliance director, owned ten percent of the company's stock. The Husband's average income for the three years prior to trial exceeded $125,000.

The Wife, on the other hand, had a high school education and worked outside the marital home for only seven years of the parties' seventeen-year marriage. The Wife worked at General Appliance for approximately four of these seven years. Primarily, the Wife served as the family's homemaker and as caretaker of the parties' child. The Wife also supported the Husband by participating in General Appliance business trips and social functions. In 1995, the Wife was diagnosed with chronic fatigue and immune dysfunction, and she was seeking counseling to treat depression associated with this illness. Despite her illness, the Wife was physically capable of working. Since the parties' separation, the Wife had tried to find employment at various retail establishments; however, the Wife had been offered only part-time, minimum-wage employment at a health food store.

In the final divorce decree, the trial court awarded the parties joint custody of their minor daughter, with the Wife to have primary physical custody of the child, per the parties' stipulation. The trial court ordered the Husband to pay child support in the amount of $1,559 per month based on the court's finding that the Husband's gross annual income was $126,958. In

calculating the Husband's gross annual income, the trial court included bonuses which the Husband had received the previous three years from General Appliance. These bonuses averaged $45,000 per year. The trial court also ordered the Husband to pay alimony *in solido* to the Wife in the amount of $150,000, payable in monthly installments of $1,000. The trial court made the following distribution of the parties' marital property:

| ASSET | WIFE | HUSBAND |
|---|---|---|
| Marital home | $ 105,000 | |
| Household furniture | $ 17,500 | |
| 1995 Toyota | $ 22,000 | |
| General Appliance notes receivable | $ 105,533 | |
| One-half of profit sharing account | $ 78,375 | |
| Savings account | $ 4,000 | |
| 1991 Jeep | | $ 11,000 |
| One-half of profit sharing account | | $ 78,375 |
| IRA account | | $ 27,724 |
| 137 shares First Citizen Bankshares | | $ 6,028 |
| U.S. savings bonds | | $ 2,700 |
| General Appliance stock | | $ 211,606 |
| **TOTAL ASSET VALUES** | $ 332,408 | $ 337,433 |

On appeal from the final divorce decree, the Husband contends that the trial court erred (1) in ruling that the increase in value of the Husband's General Appliance stock was marital property; (2) in valuing the increase in value of the Husband's General Appliance stock; (3) in including the Husband's previous bonus income in calculating the Husband's gross income for purposes of determining child support; (4) in ruling that the marital home, which was titled in the Husband's name, constituted marital property; and (5) in awarding the Wife alimony for a period of twelve and one-half years.

## II. The General Appliance Stock

We first conclude that the trial court properly ruled that the increase in value of the

Husband's General Appliance stock was marital property. Inasmuch as the Husband received the General Appliance stock prior to the parties' marriage, the stock was the Husband's separate property. T.C.A. § 36-4-121(b)(2)(A) (1996). Any increase in value of the stock during the parties' marriage, however, constituted marital property, provided each party substantially contributed to the preservation and appreciation of the stock. T.C.A. § 36-4-121(b)(1)(B) (1996).

As this court observed in *Brown v. Brown*, 913 S.W.2d 163 (Tenn. App. 1994),

> Determining whether a spouse has made a substantial contribution to the preservation and appreciation of the other spouse's separate property is a question of fact. *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992). As a result of a 1987 amendment to the property division statute, substantial contributions are not limited to direct contributions but also include indirect contributions such as those as a "homemaker, wage earner, parent or family financial manager." Tenn. Code Ann. § 36-4-121(b)(1)(C). In order to be substantial, a spouse's contributions must be real and significant. They need not, however, be monetarily commensurate to the appreciation in the separate property's value, nor must they relate directly to the separate property at issue. *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App. 1989).

*Brown*, 913 S.W.2d at 167 (footnote omitted).

Applying the foregoing standard, we conclude that the preponderance of the evidence supports the trial court's finding that the Wife substantially contributed to the preservation and appreciation of the Husband's General Appliance stock. The Wife worked as a bank teller early in the parties' marriage but left this position when she experienced complications with her pregnancy. The Wife did not work outside the home when the parties' child was young. During this time, and throughout the marriage, she was the child's primary care giver and the family's homemaker. Moreover, the Wife made other, more direct contributions to General Appliance. The Wife worked at General Appliance for approximately four years during the parties' marriage, three of those years as manager of the business's video rental operation. The Wife also accompanied the Husband on business trips, attended company dinners and meetings, and helped to organize company social functions, such as a Chamber of Commerce dinner and an employee anniversary party. Several times per year, the Wife baby-sat her brother-in-law's daughter so that her brother-in-law, the Husband's brother, could travel on company-related business. We conclude that, when considered together, the

Wife's direct and indirect contributions to General Appliance constitute a substantial contribution to the preservation and appreciation of the Husband's stock. *See Wade v. Wade*, 897 S.W.2d 702, 714-15 (Tenn. App. 1994).

We further conclude that the evidence supports the trial court's finding that the Husband himself substantially contributed to the preservation and appreciation of his stock in General Appliance. Although the Husband and his father attempted to convince the trial court that the Husband's father was solely responsible for any increase in value in the General Appliance stock, the trial court, in its discretion, rejected this testimony. *See Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. App. 1983) (when conflict in testimony requires trial court to make determination regarding credibility of witnesses, such determination is binding on appellate court unless from other real evidence appellate court is compelled to conclude to contrary). The evidence indicated that the Husband had worked at General Appliance, a closely-held, family-owned corporation, since his graduation from the University of Tennessee. By the time of trial, the Husband was a company director and head of its appliance division.[1] The Husband was responsible for determining what appliances the company bought each year, purchasing the appliances, and then selling them to customers. The trial court's finding was further supported by the testimony of the company's certified public accountant, who stated that the Husband's father's participation in the company had "slacked off" the preceding year.

In holding that the trial court properly found the increase in value of the Husband's General Appliance stock to be marital property, we distinguish the present case from the cases cited by the Husband, *Sherrill v. Sherrill*, 831 S.W.2d 293 (Tenn. App. 1992), and *Harrison v. Harrison*, 912 S.W.2d 124 (Tenn. 1995). In *Sherrill*, this court affirmed the trial court's finding that the husband's 150,000 shares of Krystal Company stock constituted non-marital property where the evidence showed that the husband's job performance had, if any, a negative influence upon the increase in value of the stock. *Sherrill*, 831 S.W.2d at 294-95. In *Harrison*, the supreme court held that a 125-acre farm constituted non-marital property where the evidence showed that the appreciation in value of the property was due solely to the construction of an interstate across the

_____

[1]The Husband's brother was the head of the company's other major division, the furniture division.

farm rather than the activities of either party. **Harrison**, 912 S.W.2d at 126-27. In contrast, the evidence in the present case demonstrated that the Husband served as a manager and director of General Appliance during the period in question, and the trial court was justified in finding that these activities substantially contributed to the preservation and appreciation of the stock.

As for the trial court's valuation of the increase in value of the stock, the Husband contends that the trial court erred in rejecting the testimony of his expert, Richard Johnson, as to the fair market value of the stock. In **Blasingame v. American Materials, Inc.**, 654 S.W.2d 659, 666 (Tenn. 1983), our supreme court recognized three methods for determining the value of a corporation: (1) the market value method; (2) the asset value method; and (3) the earnings value or capitalization of earnings method. In initially valuing the stock, Johnson, a certified public accountant, essentially considered the latter two methods, the net asset value method and the capitalization of earnings method. **See, e.g., Elk Yarn Mills v. 514 Shares of Common Stock**, 742 S.W.2d 638, 641-44 (Tenn. App. 1987). After considering a weighted combination of these two methods, Johnson arrived at an adjusted value for the Husband's stock, which represented ten percent of General Appliance's stock. Johnson testified that the adjusted value of the stock was $42,096 in 1979 and $253,703 at the time of trial, for an increase in the stock's value of $211,607. Johnson then arrived at the fair market value of the stock by taking the adjusted value of the stock and making certain discounts for the stock's lack of marketability, the Husband's minority interest in the company, and the imminent retirement of the Husband's father, all factors which Johnson testified would negatively affect the stock's market value. In Johnson's opinion, the fair market value of the stock in 1979 when the Husband received the stock was $14,734, and the fair market value of the stock at the time of trial was $63,426, for an increase in value of $48,692.

In its final order, the trial court found the increase in value of the stock to be $211,606, the same as the increase in the stock's adjusted value. In so finding, the trial court specifically rejected Johnson's testimony as to the discounts he took in arriving at the stock's fair market value. The Husband now contends that this was error.

The trial court, in its discretion, was free to place a value on the parties' marital assets, including the Husband's General Appliance stock, as long as such value was within the range of

competent evidence submitted. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. App. 1987). In this case, the trial court's finding that the increase in value of the Husband's stock was $211,606 was within the range of the evidence presented at trial. Moreover, our review of Tennessee case law in this area convinces us that the trial court was justified in rejecting Johnson's testimony as to the fair market value of the stock. By definition, the fair market value of a corporation's stock is "the price at which the stock could be sold if both a willing seller and a willing buyer existed." *Genesco, Inc. v. Scolaro*, 871 S.W.2d 487, 490 (Tenn. App. 1993); *see also Wallace*, 733 S.W.2d at 107. This court previously has held that the market value method is an improper method for determining the value of the stock of a closely-held corporation, inasmuch as such stock is rarely traded and there is no established market for the stock. *Wallace*, 733 S.W.2d at 107. Thus, in the valuation of stock of a closely-held corporation, the market value method should be given little weight, if any. *Elk Yarn Mills*, 742 S.W.2d at 641.

In accordance with the foregoing authorities, we conclude that the trial court did not err in rejecting Johnson's testimony as to the fair market value of the Husband's General Appliance stock. The evidence showed that General Appliance was a closely-held corporation and that there was no established market for its stock. Inasmuch as the market value method should have been given little, if any, weight in the valuation of the Husband's stock, the trial court properly selected a valuation which emphasized the latter two methods of valuation, the net asset value method and the capitalization of earnings method. *See Genesco, Inc. v. Scolaro*, 871 S.W.2d 487, 491 (Tenn. App. 1993) (noting that, "[w]ith no established market the question simply is one of finding what part of the company -- its assets and its potential for earning a return -- is represented by each fraction of the company's ownership"). A valuation which emphasized the net asset value method was particularly appropriate in this case because of General Appliance's established pattern of accumulating earnings over the years. *See Elk Yarn Mills*, 742 S.W.2d at 643.[2]

### III. The Husband's Bonus Income

We likewise affirm the trial court's decision to include the Husband's bonus income from previous years in the Husband's gross income for purposes of determining child support. In

---

[2]General Appliance had retained earnings of $650,083 in 1979 and $2,194,807 in 1996.

entering its initial child support order, the trial court was required to calculate the Husband's child support obligation using the Husband's average income over the past two years. *See Mayfield v. Mayfield*, No. 01A01-9611-CV-00501, 1997 WL 210826, at *6 (Tenn. App. Apr. 30, 1997); Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(e) (amended 1994). Under the Child Support Guidelines, this average amount is presumed to be correct unless it is rebutted by either party. *Id*.

In the present case, the Husband attempted to rebut this presumption by testifying that, although he received bonuses averaging $45,000 for the years 1993, 1994, and 1995, he did not receive a bonus for the year 1996. Again, however, we consider this to be a credibility issue which the trial court was in the best position to determine. *See Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. App. 1983). The evidence demonstrated that the Husband had received this bonus for the past three years and, with the exception of 1996, there was no evidence that the Husband would not receive similar bonuses in the future. Accordingly, we conclude that the trial court did not err in including these bonuses in the Husband's gross income for purposes of determining the Husband's child support obligation.

### IV. The Marital Home

Inasmuch as the trial court was in the best position to judge the credibility of the witnesses, we also affirm the trial court's ruling that the entire value of the marital home constituted marital property. The Wife believed that the marital home was titled in the names of both parties when it was purchased in 1980. During these divorce proceedings, however, the Wife learned that the home was titled in the Husband's name only.

The resolution of this issue turned on the testimony of the Husband and the Husband's father as to whether $55,000 in cash gifts made by the Husband's parents were intended as gifts to both parties or to the Husband only. Although the Husband's father testified that the gifts were for the Husband only, certain evidence in the record suggested otherwise. Even the father's testimony on this issue was equivocal. For example, regarding $15,000 given as a down payment on the marital home, the Husband's father gave the following testimony:

Q      Now, when Mark [the Husband], your son, and Janice [the Wife] bought a home on Lake Road you and [your] wife gave **them** $15,000 --

A      Yes, sir.

Q      -- to Mark to help **them** do that, didn't you?

A      Yes, sir.  (emphasis supplied).

The Husband's father and mother made an additional gift in 1990 when they credited $40,000 against the note on the house, thereby eliminating most of the debt on the home.  Again, the Husband's father testified that the $40,000 gift was to the Husband only; however, this amount was consistent with a finding that this was a gift to both of the parties.  The Husband's father acknowledged that he was aware that he and the Husband's mother could each give $10,000 to each of the parties (for a payment to each party of $20,000 and a total payment of $40,000) without paying any gift tax on the gifts.  Despite this knowledge, the Husband's father was "not sure" whether he filed a gift tax return on the additional $20,000 gift.  The trial court found that he had not.

Moreover, we note that, when questioned at trial, the Husband was unable to explain why he titled the marital home in his name alone:

Q      . . . Now, the $15,000 was given to you when?

A.      When **we** bought -- as a down payment on the house.

Q      Okay.

A      Whenever the house was executed, when it became my property.

. . . .

Q      Okay.  Now, in November of 1980, was there any special reason why you put that house in your name alone?

A      No, sir.

Q      Well, why did you do that then?  I'm just curious.

A      I don't know.  (emphasis supplied).

After carefully reviewing the testimony of the witnesses, we conclude that the evidence does not preponderate against the trial court's finding that the gifts toward the marital home were intended

to be gifts to both parties.

## V. The Alimony Award

Finally, we affirm the trial court's decision to award the Wife alimony *in solido* in the amount of $150,000, payable in monthly installments of $1000. The trial court has broad discretion in determining whether to award alimony. *Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn. App. 1993). Here, the parties stipulated that the Wife was entitled to an award of alimony *in solido* but merely disagreed as to the amount of alimony to be awarded. In deciding the amount of alimony to be awarded in this case, the trial court was required to consider the following factors:

    (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

    (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

    (C) The duration of the marriage;

    (D) The age and mental condition of each party;

    (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

    (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

    (G) The separate assets of each party, both real and personal, tangible and intangible;

    (H) The provisions made with regard to the marital property as defined in § 36-4-121;

    (I) The standard of living of the parties established during the marriage;

    (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

    (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

T.C.A. § 36-5-101(d)(1) (1996). Of these factors, need and the ability to pay are the most critical. *Loyd*, 860 S.W.2d at 412.

An application of the foregoing factors reveals that the Wife has the need, and the Husband has the ability to pay, alimony in the amount awarded by the trial court. Specifically, the trial court found that:

> The wife (plaintiff) is 50 years old and has a high school education. During the 17 years of marriage, the wife worked for about seven years but has not worked in several years. Part of the time, she worked for the General Appliance and Furniture Company, Inc. The jobs which she has held have been low paying jobs, and she has no special skills or training. The wife testified that she has chronic health problems including a chronic fatigue syndrome and depression. There is no evidence in the record that these conditions will prohibit her from holding some type of employment.
>
> The husband is 43 years of age and has a college education. Since his graduation from college, he has been employed by General Appliances and Furniture Company, Inc., a family owned business. The husband is in good health.

The trial court further found that the Husband's average annual income was $126,958, an amount more than sufficient to pay the $1000 per month alimony awarded by the court. Based on these findings, we conclude that the trial court did not abuse its discretion in awarding the Wife alimony *in solido* in the total amount of $150,000. *See, e.g.*, *Dover v. Dover*, 821 S.W.2d 593, 594 (Tenn. App. 1991) (affirming award of periodic alimony to wife in amount of $3,000 per month and alimony *in solido* of $100,000 where husband's annual income was $450,000, wife's earning capacity was $24,000, and wife worked part-time throughout marriage while rearing parties' two children).

## VI. Attorney's Fees and Conclusion

The Wife has requested an award of her attorney's fees incurred on this appeal. We note that the trial court denied the Wife's request for attorney's fees below based on the court's finding that the Wife was awarded sufficient assets with which to pay her own attorney. In light of

this finding, we similarly decline to award the Wife any attorney's fees incurred on this appeal. ***See***

***Ingram v. Ingram***, 721 S.W.2d 262, 264 (Tenn. App. 1986).

The final divorce decree entered by the trial court is affirmed. Costs of this appeal are taxed to the Husband, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
HIGHERS, J. (Concurs)