IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2005 Session

**KNOXVILLE COMMUNITY DEVELOPMENT CORPORATION
v. EMANUEL BAILEY**

**Appeal from the Circuit Court for Knox County**
**No. 3-522-99     Wheeler A. Rosenbalm, Judge**

_____

**No. E2004-01659-COA-R3-CV  - FILED JUNE 21, 2005**

_____

This case involves a dispute over compensation for property taken by eminent domain.  The Knoxville Community Development Corporation insisted that the property was worth only $19,500 and deposited that amount into the court.  The landowner claimed it was worth much more.  Following a trial, the jury found the fair market value of the property to be $25,700.  The landowner appeals, contending that the trial court erred in instructing the jury that they could consider the tax assessment figures in their valuation of the property.  We agree, and we reverse the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Carl W. Eshbaugh, Knoxville, Tennessee, for the appellant, Emanuel Bailey.

James N. Gore, Jr., Knoxville, Tennessee, for the appellee, Knoxville Community Development Corporation.

**OPINION**

**I.**

The property at issue in this case is a two-story commercial building located on a 26 foot by 50 foot lot on University Avenue in the Mechanicsville area of Knoxville.  Emmanuel Bailey, an electrical engineer by profession, purchased the property in 1988 for $27,100.  He invested in improvements and repairs to the building, spending about $30,000 in all.  He fixed the roof, built a central corridor to the interior stairway on the first floor with steel fireproof doors on both sides, and installed a laundromat, a kitchen, and additional restrooms.

Mr. Bailey operated the laundromat himself.  Other sections of the building were rented out for a restaurant and lounge and for a trucking dispatch office.  By 1998, for reasons that are unclear from the record, all of Mr. Bailey's tenants had left, and he closed the laundromat.  Several windows were subsequently broken in the vacant building, and Mr. Bailey had them covered with plywood.

In 1998, the Knoxville Community Development Corporation (KCDC) decided to acquire the subject property and other properties in Mechanicsville for a federally-sponsored neighborhood revitalization program called the Hope VI project.  KCDC notified the affected property owners of its intentions and called a public meeting to inform them of the agency's plans, the acquisitions process, and the landowners' rights, including the right to commission an independent appraisal.

In October of 1998, Wayne Underwood, a licensed appraiser hired by KCDC, appraised nine pieces of property in the neighborhood, including the subject property.  Because Mr. Bailey was unavailable, the appraiser was unable to inspect the interior of the building.  Judging from the roughness of its exterior appearance, he concluded that it was just a shell.  Mr. Underwood used the sales prices of vacant buildings in a different area of town as a basis for comparison and determined that Mr. Bailey's property had a fair market value of $19,500.

On August 18, 1999, KCDC filed a Complaint for Condemnation of the property together with a Declaration of Taking in the Circuit Court of Knox County, and deposited $19,500 into the court. On October 19, 1999, the court filed an Order of Taking.  The following day, Mr. Bailey filed an Answer and Counter-Complaint.  He asked the court to set aside its Order of Taking and requested that a jury be allowed to determine the fair market value of the property, which he contended could be as high as $50,000.  In an Amended Complaint, he claimed that the fair market value of the property could be as high as $150,000.

Mr. Bailey subsequently hired another licensed appraiser, G.T. Ballenger, Jr., to produce his own appraisal of the property.  Mr. Ballenger was able to inspect both the interior and the exterior of the building.   He analyzed the value of the property using the three generally recognized approaches: the comparable sales approach, income approach, and cost approach.  *See Spring Hill, L.P. v. Tennessee State Bd. of Equalization,* No. M2001-02683-COA-R3-CV, 2003 WL 23099679 (Tenn. Ct. App. Dec 31, 2003 )(no Tenn. R. App. P. 11 application filed).  *See* also *Elk Yarn Mills v. 514 Shares of Common Stock of Elk Yarn Mills, Inc.*, 742 S.W.2d 638, 642 (Tenn. Ct. App. 1987). Mr. Ballenger's final report recited a fair market value of $73,500.

## II. TRIAL PROCEEDINGS

The case was tried before a jury on February 17 and 18, 2004.  Four witnesses testified, including the two real estate appraisers, Mr. Bailey himself, and Terrance Carter, a former program coordinator for KCDC.  For the purposes of this appeal, we need only discuss the testimony of the appraisers.

**A.**

G.T. Ballenger, Jr. testified that he had been involved in real estate and appraisals for forty-seven years and that he and members of his family had themselves owned property in Mechanicsville at times. He stated that he had inspected Mr. Bailey's building both inside and out, and that for the purpose of comparable sales analysis, he had used recent sales of three other small commercial buildings in the same neighborhood, all occupied by small businesses, and all located within a few blocks of the subject property. After visiting those buildings and talking to their occupants, he concluded that the sales comparisons produced a valuation of $74,500.

Mr. Ballenger also appraised the property using an income approach. Relying on figures supplied by Mr. Bailey, he estimated that the property could generate $15,300 per year in rents. He reduced that figure by ten percent to allow for vacancies because of high turnover, and also subtracted likely expenses, including management fees, taxes, insurance, maintenance, utilities, and reserves for basic repairs. This process resulted in estimated net income of $7,960. Mr. Ballenger assumed that an individual investing in the property would want at least an 11% return, and he calculated a valuation of $72,500 based upon such a return.

To appraise the property under the cost approach, Mr. Ballenger estimated that replacing the building with a comparable structure would cost $67,100. Adding $4,000 to this figure for the value of the land, he reached an appraisal value of $71,200. The witness stated, however, that because of the age of the building, he did not consider replacement cost a useful approach for determining the value of this particular property. He therefore gave no weight to the cost approach. Instead, he gave equal weight to the comparable sales approach and to the income approach, and came up with an appraisal value of $73,500.

Mr. Ballenger's twenty page appraisal report was entered into evidence. On cross-examination by counsel for KCDC, the following exchange took place.

Q.      You mention on page nine of your report the tax assessment of $7,040. Why did you include that?

A.      That's just a normal thing we always put in. I put that in every appraisal I've ever done.

Q.      In fairness, that's not the appraisal value for the tax assessor's office, because they calculate that on a percentage of the actual appraised value, is that correct?

A.      That's correct, but in every report, we always do for – not necessarily here, but the banks and everything else, it's just a standard item that's required on all the reports that we do.

Q.      So I don't want to mislead, the appraised value wasn't $7,040, the appraised value from the tax assessor was more like $17,500.  Is that correct?

A.      That would be 40 percent of whatever the property assessor's estimate of value was.[1]

On redirect, Mr. Ballenger testified that while tax information is normally included in an appraisal report, it plays no role whatsoever in the process of determining the fair market value of the property.  There was no objection to the discussion of the tax assessment.

**B.**

Wayne Underwood testified that he had been doing appraisals since the early 1980s and that he was hired by KCDC to appraise nine properties for their Hope VI project.  He stated that he had made several attempts to contact Mr. Bailey by phone or letter, but was unable to reach him, apparently because Mr. Bailey was traveling at the time.  Mr. Underwood then made an exterior inspection of Mr. Bailey's building, and found in to be in poor condition and that it had not been properly maintained for several years.

Based on his observations, Mr. Underwood concluded that the subject property was just a shell.  He looked for comparable sales of other vacant two-story commercial buildings in Mechanicsville in similar condition to serve as a basis for his analysis, but could not find any.  He then looked further afield and found several such buildings in the downtown area, which adjoins Mechanicsville.  Using a sales price per square foot calculation, he formed an opinion that the fair market value of the subject property was $19,500.

Mr. Underwood admitted on cross-examination that an appraisal based solely on inspection of the exterior of a building could be wrong.  However, on direct questioning, he had stated that, "It's been my general experience that the condition you may see the building on the outside is probably reflective of what you're going to see on the inside.  If it hasn't been maintained on the outside, it probably hasn't been maintained on the inside."

**C.**

In his closing argument, KCDC's attorney referred to the tax assessment of Mr. Bailey's property, stating in part, "[n]ow the Judge is going to tell you the tax appraisal is not something that you should rely upon to place a value on this property.  That's for you to decide, but is it a factor for you to consider? I think that it is." He then went on to attack the credibility of Mr. Ballenger, arguing that the wide divergence between the tax assessment amount and Mr. Ballenger's appraisal made his entire appraisal suspect.

---

[1]In Tennessee, real property which is classified as industrial or commercial is assessed for tax purposes at 40% of its value.  Tenn. Code Ann. § 67-8-501(a).

After closing arguments, the trial judge gave the jury its instructions, including the following.

> Now, with respect to tax appraisals, the evidence for the tax appraisals was submitted without objection, and so you will give it such weight as you feel that it's entitled. You're instructed the tax appraisals are no more than someone's opinion about the value of the property, a piece of property upon a particular date, and in this case, therefore, you will treat that as opinion testimony.

The jury then met to consider their verdict. It found that the fair market value of the subject property was $25,700. It also found that Mr. Bailey was entitled to his moving expenses in the amount of $1,000. The court entered a judgment consistent with the verdict. Mr. Bailey filed a Motion for New Trial or to Alter or Amend the Judgment, arguing that the trial court erred by instructing the jury that it could consider the tax appraisal to be relevant evidence on the question of the property's value. The court denied the motion. This appeal followed.

### III. JURY INSTRUCTION

On appeal, Mr. Bailey renews his argument that the trial court's jury instruction about the tax appraisal was contrary to Tennessee law and that it prejudiced his constitutional right to trial by jury. He cites several cases for the proposition that tax assessment evidence has no legitimate role to play in condemnation cases.

In *Wray v. Knoxville, LaFollette & Jellico Railroad Co.,* 82 S.W. 471 (Tenn. 1904), the Tennessee Supreme Court reversed a jury verdict because of several errors by the trial court, including the admission of a tax assessment into evidence. In *West Tennessee Power and Light Co. v. Hughes,* 15 Tenn. App. 37 (Tenn. Ct. App. 1932), this court stated that the trial court was correct to exclude all evidence of tax assessments. In *Knoxville Housing Authority v. Bower,* 308 S.W.2d 398 (Tenn. 1957), our Supreme Court found the admission of a tax assessment to be harmless error, because the disparity between the property value found by the jury ($11,500) and the amount of its assessed value ($600) was so great that it indicated that the jury did not consider the assessment in its deliberations.

The reason tax assessments are excluded from evidence in condemnation cases is because such assessments are conducted for a purpose that is entirely different from establishing just compensation for public acquisition of private property and because the tax appraiser uses a very different appraisal process for that purpose.

> This court knows judicially and as part of the financial history of the state, that land is never assessed for purposes of taxation at its real cash value, though that may be the law, but only in comparison with other lands around it. . . .

*Wray*, 82 S.W. at 475.

In a recent case, *City of Murfreesboro v. Worthington*, No. 01A01-9703-CV-00124 (Tenn. Ct. App. December 17, 1997)(no Tenn. R. App. P. 11 application filed), this court was faced with the question whether tax assessment documents may be used for the limited purpose of impeaching a witness. We noted that a minority of states did allow tax assessment evidence to be used for this purpose, but that the majority did not, and we found the majority view to be more persuasive.

KCDC does not take issue with the holdings in the above-cited cases, but emphasizes the fact that in every one of them, the appellant made timely objection to the introduction of tax assessment information or documents. In the present case, the property-owner's attorney did not make any such objection. KCDC argues that Mr. Bailey is accordingly ineligible for relief because of the operation of Rule 36(a) of the Tennessee Rules of Appellate Procedure.

That rule authorizes appellate courts to grant whatever relief a party is entitled to on the law and the facts, but declares that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."

We note that the language of the above-cited rule does not bar the appeals courts from granting a party relief from errors that have not been timely objected to, but merely relieves our courts from any obligation to do so. Several decisions have indicated that our courts have some discretion in the application of Rule 36(a) and should grant the relief requested when the strict application of the rule would result in substantial injustice. *See State v. Brimmer*, 876 S.W.2d 75, 82 (Tenn. 1994); *State v. Johnson,* 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998).

In the present case, however, Mr. Bailey's challenge is not to the admission of the tax assessment figures per se, but rather to the trial court's instruction to the jurors that they could consider those figures in their deliberations. Rule 51.02 of the Rules of Appellate Procedure deals specifically with the timing of objections to jury instructions:

> After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for new trial.

The Advisory Commission Comments for Rule 51.02 state that " . . . errors in the charge should be available as grounds for relief on motion for new trial or on appeal, subject to the rules regarding harmless error." As we stated above, Mr. Bailey's motion for new trial asserted that the disputed jury instruction amounted to reversible error.

KCDC argues that the jury instruction constitutes "invited error," and cites *Gentry v. Betty Lou Bakeries*, 100 S.W.2d 230 (Tenn. 1936), for the proposition that such an error precludes the property owner from being entitled to relief. In *Gentry*, the judge charged the jury that the defendant bakery was required to use "a reasonable degree of care and caution" in preparing its packaged bread. After the jury returned a verdict for the defendant, the plaintiff argued that the charge was deficient because a manufacturer of food for public consumption is actually held to a higher duty than ordinary care in the preparation of such commodities. Our Supreme Court held, however, that the judge's instruction was invited error, because the plaintiff's pleadings had only charged the defendant with failing to exercise proper care, and she did not request any instruction in regard to a higher degree of care.

The present case is not directly analogous. Herein, tax assessment figures were included in the reports prepared by both licensed appraisers, and both appraisals were admitted into evidence. Although Mr. Bailey's attorney failed to object when the opposing attorney asked Mr. Ballenger questions about the tax assessments, he attempted to cure any prejudice by eliciting testimony from the appraiser that such assessments were never used as part of the appraisal process.

KCDC's attorney used the tax assessment in his closing argument to undermine the credibility of Mr. Ballenger and to suggest that by virtue of being closer to the assessment, Mr. Underwood's appraisal was also closer to the fair market value of the property. The trial court instructed the jurors that they could treat the assessments as opinion testimony.

The jury instruction was clearly erroneous since tax assessments cannot be considered in determining fair compensation for land taken by eminent domain. Under the circumstances, we do not believe it can be considered invited error. The only remaining question, then, is whether it was harmless error or reversible error. Reversible error is error involving a substantial right, which more likely than not affected the outcome of the case or prejudiced the judicial process. Tenn. R. App. P. 36(b).

KCDC argues that since the final figure adopted by the jury, $25,700, was above its own appraiser's figure and below its adversary's figure, we should affirm because the outcome was within the "range of reasonableness." We agree that if the jury had arrived at its figure without the erroneous jury instruction we would have been compelled to affirm it.

KCDC further argues that since it is the jury's role to weigh the credibility of the witnesses, it would be improper for us to substitute our own judgment for the jury's. However, KCDC argued credibility by using the tax assessment to undermine the credibility of Mr. Bailey's appraiser, in contravention of the holding of *City of Murfreesboro v. Worthington*, *supra.*

Analysis of the jury verdict makes it appear likely that the erroneous jury instruction did in fact affect the outcome. The $25,700 verdict is only slightly more than KCDC's appraisal amount of $19,500 and the tax assessment of $17,500. All three figures can be considered to be in the same

ballpark. At the same time, the verdict is only about a third of the figure that Mr. Bailey's appraiser calculated. Not only is it not in the same ballpark, it is on the other side of town.

In light of the fact that Mr. Ballenger thoroughly inspected the property, and analyzed its value under the three recognized approaches, while Mr. Underwood failed to inspect the interior, made assumptions about the building that were not accurate, and compared it to properties in a different neighborhood, it is difficult for us to conclude that the jury was not influenced by the tax assessment and by the inferences KCDC's attorney encouraged the jury to draw from the assessment. We therefore reverse the trial court.

**IV.**

The judgment of the trial court is reversed. We remand this case to the Circuit Court of Knox County. Tax the costs on appeal to the appellee, the Knoxville Community Development Corporation.

_____
PATRICIA J. COTTRELL, JUDGE