# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 8, 2016 Session

## ATHLON SPORTS COMMUNICATIONS, INC. v. STEPHEN C. DUGGAN, ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 121787III    Ellen H. Lyle, Chancellor

---

### No. M2015-02222-COA-R3-CV – Filed October 17, 2016

---

This appeal arises from a dispute over the fair value of stock in a dissenting shareholders case. Athlon Sports Communications, Inc. ("Athlon") completed a merger ("the Merger") which converted the minority dissenting shareholders' ("Defendants") shares into cash consideration and terminated their rights as shareholders. Athlon offered cash consideration for the shares at $0.10 per share. Defendants contend that their shares are worth at least $6.48 per share. Athlon sued Defendants to determine judicially the fair value of these shares. This case was tried before the Chancery Court for Davidson County ("the Trial Court"). After a trial, the Trial Court, applying the Delaware Block Method[1] for determination of share value, found that the share value was $0.10 per share as of the date of the Merger. Defendants appeal to this Court, arguing that (1) the Delaware Block Method is ill-suited for a business like Athlon attempting a new venture, and is antiquated, generally; and, (2) that the Trial Court erred in its application of the Delaware Block Method. We find and hold that, under Tennessee law, the Trial Court properly utilized the Delaware Block Method. We find and hold further that the Trial Court considered the competing expert testimony, accredited Athlon's expert, and the evidence does not preponderate against the Trial Court's factual findings. We affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

---

[1] The Delaware Block Method, explained in more detail later in this opinion, consists of analysing a company's (1) market value, (2) asset value, (3) investment value, and assigning weight to each category as appropriate.

John R. Jacobson and W. Russell Taber, III, Nashville, Tennessee, for the appellants, Stephen C. Duggan, Daniel R. Grogan, and Robert Kelly Grogan.

Paul S. Davidson and Laura P. Merritt, Nashville, Tennessee, for the appellee, Athlon Sports Communications, Inc.

## OPINION

### Background

Athlon, a private, closely-held sports media company, was founded in 1967. Athlon published a sports magazine for decades. The Great Recession saw a downturn in Athlon's fortunes. In 2010, Stephen Duggan ("Duggan"), a certified public accountant, presented Athlon with a turnaround plan for the company. Duggan's vision was to launch a sports monthly publication called "Athlon Sports" which would be distributed in newspapers. Athlon agreed with the proposal and hired Duggan. Duggan purchased a 15% ownership share of Athlon for $1,500,000 at the negotiated price of approximately $6.75 per share. At the time of this investment, a firm, Lattimore Black, conducted a valuation of Athlon. The valuation yielded a value of zero for Athlon, short of reaching Duggan's goals. Duggan acknowledged that he agreed with this valuation.

Initially, there were grounds to believe Duggan's plan was bearing fruit. Athlon received positive reviews and circulation was significant. However, circulation did not equate to higher ad revenue. The contracts Athlon entered into with newspapers were short-term and non-exclusive. Athlon's financial circumstances continued to deteriorate. The parties dispute whether Duggan was hindered in pursuing outside capital. In any event, 2011 saw more struggles. Athlon sold the building it had used for twenty years. As the building had been collateral for its line of credit, Athlon used the proceeds of the sale to pay off the $1.7 million it owed on the line of credit. Athlon directors took permanent pay cuts. Athlon also gave up the key man life insurance policy it retained on its Chairman of the Board, Spencer Hays ("Hays"). Duggan oversaw the preparation of a Confidential Information Memorandum as a means of attracting would-be investors.

In November 2011, Athlon convened a special meeting of its Board. At this meeting, Duggan resigned as president and chief executive officer of the company. Athlon thereafter sought a new valuation of the company. 2nd Generation Capital was the firm chosen to undertake this valuation, which was conducted by Michael Collins ("Collins"). In spring of 2012, the situation remained bleak for Athlon. Accordingly, the Merger was proposed, whereby only certain holders of Athlon stock could participate in the new corporation. To Defendants, however, this move represented their being

squeezed forcibly out of the company. In March 2012, Collins presented his valuation findings to Athlon's Board. Collins opined that the fair value of the company was "$NIL." Collins also rendered a fairness opinion. Hays and Duggan proceeded to negotiate over share price. Hays finally offered the dissenters $0.10 per share. The Merger was consummated on August 10, 2012. Defendants—Duggan, Daniel R. Grogan and Robert Kelly Grogan, demanded $6.18 per share instead. Athlon then filed this action under Tenn. Code Ann. § 48-23-101, *et seq.*, for a judicial appraisal. This matter was tried over the course of several days in August and September 2015. At trial, Athlon and Defendants put on their respective valuation experts.

In October 2015, the Trial Court entered its final order. The Trial Court found that the fair value of Athlon stock was $0.10 per share. The Trial Court, in its very detailed and thorough final order, found and held, in part, as follows:

> Tennessee Code Annotated sections 48-23-101 through 302[2] provide a procedure for a shareholder to dissent from the share value determined upon a plan of merger. If the dissenter's demand remains unsettled, the parties are provided a judicial proceeding in sections 48-23-301 through 303 to determine the fair value of the dissenter's shares. That is what occurred in this case.
>
> In March of 2012, the Company considered a Plan of Merger, by and between the Company and Athlon Merger Subsidiary, Inc. Prior to the meeting, the Board of Directors had requested that a fair value opinion be prepared by 2nd Generation Capital, LLC ("2nd Generation"). The opinion rendered to the Board was that the fair value, on a going concern premises value, of a pro rata portion of the 100% equity interest of the Company was $Nil for both preferred and common shares. In a separate fairness opinion requested by the Board, 2nd Generation also opined that the Merger was fair, from a financial standpoint, to the shareholders of the Company assuming cash consideration of $0.01 per share. 2nd Generation's fairness opinion was provided to each of the shareholders in advance of the vote to approve the Merger. After various merger plans and offers of various cents per share were made by the Chairman of the Board, Spencer Hays, and Defendant Duggan, Mr. Hays' Plan of Merger was approved based upon cash consideration of $0.10 per share. Thereafter the Merger was consummated on or about August 10, 2012. The Company, as the surviving corporation, sent a dissenter's notice advising of the effectiveness of the Merger and providing a form of payment demand in accordance with

---

[2] Parts of the applicable Code were revised effective January 2013. The prior Code version applies to this case.

Tennessee Code Annotated section 48-23-203. On October 5, 2012, the Company sent each dissenter a fair value payment check for the cash consideration of $0.10 per share plus interest and other information required by Tennessee Code Annotated section 48-23-206. From October 26-29, 2012, the Company received from the Defendants letters pursuant to Tennessee Code Annotated section 48-23-209 demanding further payment based on their number of shares at an estimated fair value of $6.18 per share. In subsequent correspondence, the parties were unable to agree on the fair value of the shares. As per Tennessee Code Annotated section 48-23-301, when the demand for payment remained unsettled, within 2 months after receiving demand for payment, the Company commenced this proceeding. Section 48-23-301 provides that, upon such a proceeding being filed, the Court shall determine the "fair value of the shares and accrued interest." The components the Court must consider in determining "fair value" are defined in Tennessee by statute and case law. The <u>timing</u> for assessment of fair value is provided in Tennessee Code Annotated section 48-23-101(4). It states that fair value with respect to a dissenter's share means the value of the shares:

> immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action . . . .

In addition to this statutory identification of the time of the assessment, case law identifies the <u>method</u> of assessment. As well explained in the trial briefs of each attorney in this case, Tennessee uses the Delaware Block method to determine fair value for dissenters. *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 667 (Tenn. 1983); *Elk Yarn Mills v. 514 Shares of Com. Stock*, 742 S.W.2d 638, 640 (Tenn. App. 1987). Under Delaware Block, the corporation is analyzed based upon market value, asset value, and earnings value. Explanation of these is paraphrased from and citation to authorities is derived from the trial briefs of counsel as follows.

<u>Market Value Approach</u>—"The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. This method is most reliable when there is an established market for the stock." *Blasingame*, 654 S.W.2d at 666. Where there is no reliable market because the stocks were not traded, there is no or sporadic trading history "market price is not considered at all." *Genesco, Inc. v. Scolaro*, 871 S.W.2d 487 (Tenn. Ct. App. 1993).

<u>Asset Value Approach</u>—"The asset value method looks to the net assets of the corporation valued as a 'going concern,' each share having a pro rata value of the net assets. The net assets value depends on the real worth of

the assets determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence." *Blasingame*, 654 S.W.2d at 666. The asset approach is weighed more heavily when the company holds assets for appreciation purposes rather than for commercial, retail or wholesale purposes designed to generate earnings. *Id.*

Earnings Value Approach—"The investment method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings records. Dividends paid by the corporation are considered its investment [earnings] value." *Id.*

These values are then weighted to customize the valuation to the particular circumstances of the corporation. Next, the value found by each of the three methods is then "multiplied by the weighted factor expressed as a percentage of the whole so that the products of the calculations when added together will equal one hundred percent and represent the total value of each share." *Elk Yarn*, 742 S.W.2d at 640. While there is this formula under Tennessee law, the ultimate value of the stock is not formulaic. The formula is a tool to assist rendering a judgment of share value customized to the unique features and facts of individual companies. As quoted from the case law above, the unique facts and circumstances of a company determine whether values are assigned for market, asset and earnings, and the amount of that value. If no reliable market for the stock exists, that value is not considered. Asset value depends upon real worth as indicated by appreciation, not commercial, retail or wholesale purposes. The earnings valuation looks to a track record and payment of dividends. *Blasingame*, 654 S.W.2d at 666. In addition to the unique facts and circumstances of a corporation being determinative of the amounts attributed to market, assets and earnings, the corporation's unique features also factor into the weight given to the market, asset and earnings values: "The weight to be given the particular values takes into consideration the type of business, the objectives of the corporation and other relevant factors." *Id.* In these ways, the Delaware Block formula Tennessee uses takes into account the individual circumstances of the company being valued. Accordingly, to apply these principles of law in determining fair value, the Court turns to the evidence of the unique facts and circumstances of the Company to make those findings and determine their outcome for valuing the Company's stock under Tennessee law.

Founded in 1967, the Company is a Nashville-based media business engaged in publishing and sports marketing. It employs about 82 persons. The Company, prior to 2010 ("hereinafter referred to as Legacy Athlon"), focused its business on pre-season sports annuals to target enthusiasts in college, fantasy and professional football, basketball, baseball, racing and

golf. Legacy Athlon made money through sales of advertising in the annuals. "The Company's trade communication programs have historically been anchored by mailings of sports annuals to a highly targeted audience for a particular advertiser—typically a customer, distributor or sales team—along with marketing collateral and an invitation to join in a season long interactive digital content." Trial Exhibit 36. Until 2008, Company profits were small but steady. In 2008, profits declined, and in 2009 the Company declined by 35%. Its only assets were its Building and key man insurance against which Legacy Athlon had taken out loans to meet liquidity needs. Legacy Athlon's decline is seen in its Financial Statements, which were made trial exhibits, and show these revenues:

$20.1 million in 2006
$20.8 million in 2007
$19 million in 2008
$13.5 million in 2009

In 2010, Defendant Stephen Duggan approached Legacy Athlon with a distribution strategy for its content to turn around the business. Mr. Duggan is a sophisticated, experienced and knowledgeable investor, and analyst of companies and their operations and finances. He is a CPA who has served as an officer on the boards of several companies, and as a controller and CFO. He has performed and supervised audits. Before 2010, Mr. Duggan had experience with a prior company in launching a newspaper-distributed magazine. Mr. Duggan's strategy for Athlon was that sports content would be provided in a monthly magazine inserted into local newspapers and distributed to their readers (hereinafter referred to as the "Sports Insert") to enable national advertisers to target a male audience and to generate revenues for the Company from the advertising. At a March 12, 2010 meeting of the Company's Board, Defendant Duggan presented two cases for his initiative: a base case and a worse case (trial exhibits 11 and 12). Following that, the Board offered Defendant Duggan the opportunity to purchase 222,1100 [sic] shares or 15% of Series A Preferred Company stock for $1.5 million; a voting seat on the Board; employment as President of the Newspaper Magazine Division with a compensation base and incentives, employment agreement, and severance package; and personal incentive and management restricted stock. Defendant Duggan accepted. In connection with Defendant Duggan's tax basis valuation needs for the stock, a valuation of the Company as of April 22, 2010 was prepared by Lattimore Black Morgan & Cain (trial exhibit 107). That report valued the Company at zero. Defendant Duggan has testified that he agreed with that zero value. The enterprise was given an $8.1 million rounded value by Lattimore Black, with underlying common

share equivalent value of $1.85/share and fair market value of the restricted stock to be $0.98/share. On April 22, 2010, Defendant Duggan entered into several transactions with the Company memorializing the stock and employment terms listed above. Trial Exhibits 13-17. The parties then embarked upon implementing Defendant Duggan's turnaround strategy.

As time passed, a turnaround in revenue did not occur. The Company lost $2.5 million in 2010, $4 million in 2011, and $3 million in 2012. These losses were significantly greater than the worse case presented by Defendant Duggan at the March 2010 Board meeting projecting $700,000 in profits in 2011. The evidence established that costs increased related to the Sports Insert, such as printing and hiring employees, and advertising revenues never materialized near the levels of the base or worse cases projected by Defendant Duggan.

The Court finds conditions at the Company throughout 2011 deteriorated. With the exception of Defendant Duggan, Board of Director employees took permanent salary deductions. In October of 2011, the Company sold its Building of many years, using proceeds of the sale to pay off a million dollar line of credit extended to December 2011. Going into 2012 the Bank turned down the Company for a line of credit. Keyman insurance on the Company's Chairman of the Board, Spencer Hays, was surrendered.

In November of 2011, Defendant Duggan was terminated as President of the Newspaper Magazine Division of the Company. He remained on the Board. Key management included Chairman of the Board—Spencer Hays; Mary Vanderkooi—CFO; and Charles Allen—CEO.

In the ensuing months the Court finds the Company was in very bad condition. The Company consulted a bankruptcy attorney. Also, measures such as third-party investment were articulated by the Company. The extensiveness of the Company pursuing these measures is disputed by the parties.

The Court finds and accredits the evidence presented by the Plaintiff that while not preferred, the Company genuinely was amenable in latter 2011 to third party investment but that none could be located. In this regard the Court finds that the Company encouraged and gave Defendant Duggan leave to locate such investment after his employment was terminated but he remained on the Board, and he was unsuccessful in locating investors. The greater weight and preponderance of the evidence is that third-party investment was not an alternative that Mr. Hays, Ms. Vanderkooi, Mr. Allen [sic] others at the Company ignored or derailed.

The Court accredits the testimony of Plaintiff's expert and finds that in early 2012 the Company was within the zone of insolvency.

In Board of Directors meetings spanning March 9, 2012, through March 16, 2012 (trial exhibits 56-61), the Merger was proposed, considered and approved with these significant events:

--Because the Company's liabilities exceeded the cash available to satisfy them, the Company was unable to make payroll.

--A $200,000 demand note with 5% interest, upon loan by Mr. Hays, was approved to make payroll.

--2nd Generation Financial was hired to value the Company. It found the Fair Value as of February 2012 to be $NIL.

--Mr. Hays proposed that he and his co-investors would provide $2 million of additional capital to the Company with a Plan of Merger and proposed payment of $.01 per share.

--Defendant Duggan countered that in 45 days he would have investors or outside capital and proposed, first, a $.03 per share value and then a $.10 per share value.

--Mr. Hays came back with a $.10 per share value without any additional time contingency to locate investors or capital. He stated that he was ready and able to close upon shareholder approval.

--Defendant Duggan made a motion to increase his prior proposal to $0.25 per share which failed for a second.

--Mr. Hays' Revised Plan of Merger was approved.

The March 2012 Board approval led to the August 2012 Merger and dissent of the Defendants. In addition to the foregoing findings of the operations, nature and circumstances of the Company which inform valuation under the Delaware Block Method, the Court makes these findings with regard to the expert proof.

Each side retained an expert who was found by the Court to be qualified to opine on the fair value of the Company's stock. The Plaintiff's expert is CPA, Michael Collins. He also had been engaged by the Company's Board and provided the February 29, 2012 Summary Valuation Report and the March 12, 2012 Fairness Opinion Letter in connection with the Board's consideration of adoption of the Plan of Merger. Mr. Collins qualifications include these:

He holds the specialty designations of AICPA (Accredited in Business Valuation) and LFF (Certified in Financial Forensics). He is the CEO and Managing Member of 2nd Generation Capital LLC, a merchant banking, securities broker, and venture capital business headquartered in Nashville, Tennessee. Mr. Collins is also a member of KraftCPAs, PLLC. He has been qualified by several courts as an expert on valuation matters

-8-

and other professional fields and has served as a court appointed expert in the United States District Court for the Middle District of Tennessee Nashville Division. Mr. Collins has been involved as an investor, director, advisor, licensed broker, and fairness and valuation expert in merger and acquisition and other securities industry related transactions, and as an expert witness, has appeared before judges of multiple districts of the U.S. Bankruptcy Court. He has rendered expert opinions as to issues of solvency, fraudulent conveyance, plan approval and valuation. Additionally, his financial advisory and other experience includes matters specifically related to the publishing industry, including: Gannett Corporation, The Nashville Banner, Ideals Publications (purchased from Thomas Nelson and later acquired in a management buyout); The Nashville Scene; United Press International ("UP"); Ingram Book; City Publications; Worthy Publishing; Southwestern/Great American; and Directio Comercial en EspaNol (Enlace).

The Defendants' expert is Jaime C. d'Almeida. He is a Managing Director in the Boston office of Duff & Phelps, and is part of the Dispute and Legal Management Consulting Practice. Mr. d'Almeida's qualifications include these:

He has managed over 100 valuation engagement, has over 20 years of experience in economic and valuation analysis and consulting, and has provided both deposition and trial testimony on valuation and damages issues. He is a testifying expert in corporate finance matters, specializing in shareholder disputes, appraisal rights, business divorces, solvency analyses, preference and fraudulent conveyance actions, breach of contract, merger and acquisition disputes, copyright and trademark disputes, and other commercial and economic damages analyses. He has provided advise [sic] to clients on asset-backed securities, business valuation, tangible and intangible asset valuation, solvency, financial analysis, investment analysis, fairness and solvency opinions, and analysis of complex financial structures. Mr. d'Almeida is an Adjunct Lecturer at Babson College's F.W. Olin Graduate School of Business. Prior to joining Duff & Phelps, Mr. d'Almeida was a senior manager at Ernst & Young in their Valuation and Business Modeling group; a manager of Economic and Regulatory Policy for Cable & Wireless operating companies in the Caribbean region; and a Consultant at National Economic Research Associates where he provided litigation and regulatory support in the telecommunications industry on topics including antitrust analysis, economic cost models, damage estimations, market entry issues, and economic analyses of modernizing telecommunications networks. He also worked at the Massachusetts Department of Public Utilities in the telecommunications sector. Mr.

d'Almeida received his M.B.A. in entrepreneurship from F.W. Olin Graduate School of Business at Babson College and his B.S. in electrical engineering/engineering and public policy from Carnegie Mellon University. He is also an Accredited Senior Appraiser of the American Society of Appraisers.

Mr. Collins' results for fair value of the Company's shares upon applying the Delaware Block Method are as follows:

Cost or Asset Approach (Asset Accumulation Method) -$Nil-80%
Income Approach (Investment or Earnings Value Approach) -$Nil- 20%
Market Approach -$Nil- 0%

Mr. d'Almeida's results for fair value of the Company's shares upon applying the Delaware B[l]ock Method are as follows:

Approach Value per Share [,] Weight
Net Asset Value $6.20 33%
Market Value $6.09 33%
Earnings Value $7.16 33%
Weighted Average 100%

As to these varying valuations, the Court adopts, for the most part, as its findings, Mr. Collins' expert and rebuttal reports (trial exhibit 121). The Court finds that the greater weight and preponderance of the evidence and application of Tennessee valuation law supports Mr. Collins' determinations.

The one modification the Court makes is that it determines the $0.10 per share consideration paid by the Company to the dissenters in October of 2015 was the fair value per share. The reason the Court finds the value to be $0.10 and not the zero determined by Mr. Collins is that the evidence established that Athlon's trade name had existed for 44 years and had obtained recognition. The evidence established that while this recognition was not of such an extent that it could be used as collateral or be sold for an appreciable amount or had a trademark value, it had some very, very minimal value as an intangible asset. Also, the $9 million in circulation of the Sports Insert (discussed in more detail below), the Court finds, had some very, very minimal asset value. Given the great disparity between advertising revenue, which was still insufficient, and circulation, and absence of Company assets and earnings, there was great uncertainty and risk as of the August 2012 Merger date. The Court finds there was not just a liquidity or cash flow problem; the Company was hovering around the zone of insolvency. Thus, the Court finds that the recognition of the Athlon name or brand and the $9 million in circulation, while very, very minimal, provide a $0.10 per share value.

The Court does not adopt any part or aspect of the opinion, Report or determinations of the Defendants' expert. An inexhaustive but sufficient list of the Court's reasons is the following.

1. With respect to asset valuation, the Court finds that the valuation by Defendants' Expert of the Company's trademark at $1.312 million is unsupported by the evidence. In none of the financial data, past valuations, or testimony of the Company's witnesses was there ever any value associated with or attributed to the trade name "Athlon." evidence [sic]. In none of the financial data, past valuations, or testimony of the Company's witnesses was there ever any value associated with or attributed to the trade name "Athlon."

Absent historical value, the Defendants' Expert used alleged comparable royalty rates of printing and publishing related trademarks. Trial Exhibit 121, D'Almeida Report at ¶ 66, p. 24. The Court finds, however, that the rates used are not comparable. The trade names and time of the alleged comparable licenses are the Financial Times Limited's "FT" and "Financial Times" trademarks in 2000; Callaway Golf Company's "Callaway Golf" trademark in 1999; and the National Football League Alumni's "National Football League Alumni" trademark in 1996. The August 2012 Valuation Date of the Company's stock, required by law, is years later. Also, the trade names "FT," "Financial Times," "Callaway Golf," and "National Football League Alumni," the proof established, are more well-known, national names than Athlon. The comparisons are not proper and eschew asset value.

2. The Defendants' expert identified Net Operating Losses as an asset. Both parties' experts and an expert guide Pratt, *Valuing A Business*, at 143-144, established that the use of and, therefore, value of NOLs is contingent upon generating future profits against which to apply the NOLs.

Based upon the evidence of the Company's history of significant losses, its further deteriorating financial condition from 2010-2012, and the evidence of the macro decline in the publishing and print media industry, the Court finds it is speculative to assume or conclude future profits of the Company. As this assumption/conclusion is a necessary premise to assign value to the NOLs, the Court does not adopt the assignment of value by Defendants' Expert to the NOLs to add to asset value. Also undercutting the NOL analysis of Defendants' Expert is that he made adjustments to the Company's balance sheet, to reflect the NOLs as a current asset, when deferred taxes had already taken the NOLs into account. The effect inflated the Company's working capital by $2.1 million, according to testimony of Mr. Collins, which the Court accredits.

-11-

3. As follows, the Court finds that there is insufficient evidence to support the conclusion of the Defendants' Expert on asset value that relationships the Company had developed with newspapers to distribute the Sports Insert was a $7 million or more asset:

--There was no track record. Distributorship contracts were obtained with newspapers when Defendant Duggan began the turnaround attempt in 2010. By the 2012 Valuation Date there were less than two years experience with these contracts.

--The evidence established that the newspaper circulation contracts were not long term. Usually they were up for renewal annually or at two years.

--The Court accredits the testimony of Plaintiff's Expert that his review of the newspaper distribution contracts showed there was no monetary penalty for cancellation, and the agreements were not exclusive.

--Trial exhibit 25 of the April 25, 2011 Board Minutes evidences the decline of the newspaper industry and its uncertainty.

--Also accredited by the Court is Mr. Collins' testimony, as well as Mr. Allen's, that the Company's contracts with the newspapers created a material performance liability. Print costs are locked in. The evidence was that the Company had in excess of $1 million funded by credit from printers.

--While Defendant Duggan was able to obtain payment from the newspapers for the Sports Insert, the amount was de minimus, along the lines of $200,000 per year.

--The evidence also established that the vast majority of the Company's revenue is from advertising. As digital media has become popular, advertising in print media shrinks. Although the Defendants proved Defendant Duggan was successful in achieving a $9 million circulation in 2011 the evidence also established that advertisement revenue fell largely below Defendant Duggan's worst base case.

All of these facts substantially undercut attributing a $7 million asset value to distributor relationships.

4. As to earnings valuation, the Court finds, based upon its foregoing findings, that the Defendants' Expert fails to persuade in paragraphs 80-83 of his Report that the Company's net losses do not indicate zero earnings, and he failed to persuade that there existed positive enterprise value. Additionally, and more fundamentally, the analysis of Defendants' Expert in paragraphs 80-83 of his Report, while acknowledging historical earnings, does not actually apply the requirement of the Delaware Block Method that three to five years of earnings is the predictor of future earnings. *Blasingame* , 654 S.W.2d at 666.

5. The indications Defendants' Expert used at page 28 of his Report for market value are not applicable for several reasons:

--First, there is cautionary case law that market value is usually not weighty in closely held corporations where there is little or sporadic trading. *Id.*

--Additionally, because the Company's last profit was in 2009, the Court finds that the transactions/indications used by Defendants' Expert on or before that date are not comparable and should not be used.

--The Court finds that the instances cited by Defendants' Expert where the Company did not compel employees to pay a stock purchase loan involve so many considerations of cost of pursuing, downside of negative relationships on Company business and employee relations, etc., that this forbearance is not an indication of market value.

--Projection sheets of potential stock value to illustrate the effects of future good performance or to motivate (items dated April 2010 and January-November 2011 and May 2012 on the chart on page 28 of the Report of Defendants' Expert, trial exhibit 121) are not reliable sources of value to indicate the "price for which a share is selling or could be sold a willing buyer." *Id.*

--Based upon the testimony of Mr. Hays' personal CPA, Mr. Hickman, that he used a somewhat rote number for share value of the Company when preparing Mr. Hays' financial statements for banks because that representation was not important to the banks, the Court finds those share valuations are not indicative of market value.

--Values derived by the Defendants' Expert from the Company's Stock Sale and Redemption Agreement use 3 years of historical earnings and do not take into account present conditions, so they are not indicative of market value as of the Valuation Date.

In addition to the foregoing, the Court makes these additional concluding findings.

The 2010 Duggan preferred stock transaction is not indicative of value as Mr. Duggan has testified that he knew Legacy Athlon was worthless. There also was testimony that some of the values and dollar amounts in the Duggan transaction were driven by a predetermined number to "back into." Also Mr. Duggan testified that he based his investment in the Company predominantly on his ability to grow revenues through his Sports Insert initiative.

With respect to the Confidential Information Memorandum (the "CIM"), trial exhibit 35, prepared and circulated by the Company beginning November 2011, to try to locate investors and capital, the Court accredits the testimony of Mr. Allen and Mrs. Vanderkooi that these statements were aspirational and were stated to attract the attention of

-13-

potential investors. The CIM, then, is not a reliable basis to inform share value. Further, the CIM is not accorded weight by the Court because its hope for future profits was not in keeping with the macro conditions of the industry and the track record of the Company. The CIM was, at most, puffery. Also, as Defendant Duggan was the main preparer of the CIM, there is no adversity present for the CIM to be considered some sort of concession of value by the Company.

Lastly, as to the Company's answer that the most probable outcome for the Company in 2013 was profitability (the "Answer"), in response to Mr. Collins' questionnaire he sent in his valuation analysis, the Court finds the Answer does not substantially detract from the above findings. That is because the Court finds the Answer to be an outlier. It is one isolated statement that is an exception to the greater weight and preponderance of the evidence. This concludes the findings of fact and application of law which are the basis for the Court's determination of $0.10 per share value as of August 10, 2012.

(Footnote in original)(Format modified). Defendants timely filed an appeal to this Court.

## Discussion

Although not stated exactly as such, Defendants raise the following issues on appeal: 1) whether the Trial Court erred in exclusively using the Delaware Block Method to value Defendants' shares of Athlon stock; and, 2) whether the Trial Court erred by misapplying the Delaware Block Method in valuing Defendants' shares of Athlon stock by making factual findings not supported by the evidence.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in exclusively using the Delaware Block Method to value Defendants' shares of Athlon stock. Tennessee courts have used the Delaware Block Method for some time in determining fair value for dissenting shareholders. *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 667

-14-

(Tenn. 1983), *superseded by statute on other grounds*. This Court has described the Delaware Block Method as follows:

> The Delaware Rule, or Delaware Block Method, utilizes the three primary methods used by courts in determining the fair value of shares of dissenting shareholders-the market value method, the asset value method and the investment value method-and then assigns weight to each method as may be appropriate considering the type of business, the objectives of the corporation, and other relevant factors. For example, where there is no established market and none can be reconstructed, market price is not considered at all; or in a commercial business, earnings are given great weight as the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value. *See Blasingame*, 654 S.W.2d at 667.

*Hubbell v. Sumner Anesthesia Associates, Inc.*, No. M2008-01736-COA-R3-CV, 2009 WL 1162650, at *4 n. 3 (Tenn. Ct. App. Apr. 29, 2009), *no appl. perm. appeal filed*.

Defendants' chief objection to the Delaware Block Method is their claim that its focus on past rather than prospective performance is particularly unreliable for a company embarking upon a new venture like Athlon. Delaware itself has long since departed from a strict application of the Delaware Block Method. In 1983, the Supreme Court of Delaware stated as follows:

> [T]he standard "Delaware block" or weighted average method of valuation, formerly employed in appraisal and other stock valuation cases, shall no longer exclusively control such proceedings. We believe that a more liberal approach must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court . . . . This will obviate the very structured and mechanistic procedure that has heretofore governed such matters.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 712-13 (Del. 1983).

In *Blasingame*, cited above and the seminal Tennessee case on the Delaware Block Method, our Supreme Court acknowledged the *Weinberger* case but nevertheless continued to apply the Delaware Block Method, stating:

> The Supreme Court of Delaware has recently modified the use of the "Delaware block" or weighted average method in a case involving the rights of minority shareholders in a cash out merger between the

-15-

corporation in which they held stock and its majority owner. *See Weinberger v. U O P, Inc.*, 457 A.2d 701 (Del. 1983). The modification was, at least partially, in response to a Delaware statute directing that "the Court shall take into account *all relevant* factors." *See* 8 Del.C. § 262(h) (Emphasis added.) We do not find anything in *Weinberger* that causes us to alter the adoption of the weighted average method.

*Blasingame*, 654 S.W.2d at 668 n. 1 (order on petition for rehearing).

This Court has elaborated further upon when it is appropriate to consider prospective performance in valuation:

The appellant argues that a Delaware case *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) presents a more rational approach to valuation by allowing consideration of plans in place but not yet executed on the valuation date. We are of the opinion, however, that even under the holding in that case the estimate of future performance should not be used to determine value where the evidence is entirely speculative. In this case, the vehicle through which the LLC hoped to increase its earnings had not even been created on the valuation date nor had the contracts and licensing agreements which the LLC hoped would turn out to be profitable, been finalized. Obviously, the remaining equity owners of MS Holdings hoped that their action would result in future profits, but as of the valuation date any future profits were just that, hope.

*MS Holdings, LLC v. Malone*, No. W2006-01609-COA-R3-CV, 2008 WL 1700156, at *2 (Tenn. Ct. App. April 14, 2008), *no appl. perm. appeal filed*.

The Trial Court correctly followed Tennessee case precedent in utilizing the Delaware Block Method for valuation. Our Supreme Court's 1983 decision in *Blasingame* adopting the Delaware Block Method never has been revisited or overturned by our Supreme Court. In *Blasingame*, our Supreme Court acknowledged the Delaware Supreme Court's decision in *Weinberger* which was critical of the Delaware Block Method, yet adopted that method nevertheless. While the Tennessee case law available to the Trial Court and to us in the years since *Blasingame* has refined further the approach to judicial valuation, it never has departed utterly from the Delaware Block Method as a baseline.

In the present case, the Trial Court was not rote in its application of the Delaware Block Method. Rather, the Trial Court specified that it considered the specific circumstances of the case, and weighted the factors accordingly. We also note that

-16-

Defendants' expert used, among other methods, the Delaware Block Method. The value Defendants' expert arrived at by using the Delaware Block Method generally was consistent with the value he determined using his other methods. This value was far greater than that determined by Plaintiff's expert. For example, the Trial Court found that Defendants' comparisons of Athlon with various successful start-up companies that reported poor earnings whilst still being valuable are inapposite. Defendants submit, as an alternative, that Tennessee law on valuation be modified. Mindful of *Blasingame* and its progeny, which retained the Delaware Block Method as a default method of evaluation but not necessarily its rigid application in each circumstance, we decline to do so. We affirm the Trial Court in its utilizing the Delaware Block Method, including taking into account the specific facts and circumstances of the company being valued, in keeping with longstanding case precedent in Tennessee. If the holding of *Blasingame* as to the use of the Delaware Block Method to value a dissenting minority shareholder's shares is to be reversed or modified by a Tennessee Court, it is the Tennessee Supreme Court that will have to do it and not this Court.

The next and final issue we address is whether the Trial Court erred in how it applied the Delaware Block Method in valuing Defendants' shares of Athlon stock as of the time of the Merger. Defendants argue that the best evidence for the fair value of Athlon's market share lay in the company's own financial forecasts, which were quite optimistic. In particular, Defendants point to two forecasts, one in November 2011, and one in February 2012, that depicted a rosy outlook for Athlon. The Trial Court discussed these forecasts in detail and dismissed these forecasts as "puffery," and an outlier. Further, as found by the Trial Court, "Duggan was the main preparer of the CIM [Confidential Information Memorandum] . . ." which was another fact that the Trial Court considered in determining that "[t]he CIM, then is not a reliable basis to inform share value."

We agree with Defendants that it seems an odd circumstance, to say the least, that forecasts made by Athlon and represented as reliable at the time are now dismissed by Athlon as unreliable. However, the Trial Court was tasked with placing an actual value on the Athlon shares at the date of the Merger, and, upon consideration of all of the evidence before it, the Trial Court lent little to no credence to Athlon's forecasts. The evidence does not preponderate against this or any other finding by the Trial Court.

The Trial Court heard the testimony of the parties' competing witnesses: Mr. Collins for Athlon, and Mr. d'Almeida for Defendants. Both experts used the Delaware Block Method. Mr. d'Almeida also applied the discounted cash flow method, which takes into account prospective future earnings. The Trial Court, after explaining why in great detail, adopted, with some revision, Mr. Collins' analysis. Our review of the record on appeal supports, rather than preponderates against, the Trial Court's factual

findings.  For example, the tax loss carryovers touted by Defendants are unreliable, as found by the Trial Court.  The industry analogues Defendants put forward are not all that analogous, also as found by the Trial Court.  Strong circulation numbers did not translate into increased ad revenue. The Trial Court found Athlon to have been in the "zone of insolvency," a term Defendants reject as amorphous and irrelevant.  Perhaps, but however one wishes to phrase it, Athlon's condition by reasonable metrics at the time of the Merger was poor at best.  Any hope for Athlon's turnaround in August 2012 was just that—hope.  In keeping with our opinion in *MS Holdings*, mere hope is too speculative upon which to base a valuation.  This is true even if the company in question goes on to enjoy success, as some evidence in the record suggests is currently the case with Athlon, post-Merger.  The judgment of the Trial Court determining fair value of shares of stock for the dissenting shareholders to be $0.10 per share is affirmed in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below.  The costs on appeal are assessed against the Appellants, Stephen C. Duggan, Daniel R. Grogan, and Robert Kelly Grogan, and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE